WALTER L. WAGNER
532 N 700 E
Payson, Utah 84651
retlawdad@hotmail.com
808-443-6344

FILED
U.S. DISTRICT COURT

2011 NOV 14  P 12: 33

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

# UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | | |
|---|---|---|
| WALTER L. WAGNER, | ) | Case:   2:11cv00784 |
| | ) | |
| Plaintiff | ) | **OPPOSITION TO MOTION** |
| | ) | **TO DISMISS** |
| vs. | ) | |
| | ) | |
| PRESTON MICHIE, KENNETH | ) | |
| FRANCIK, LESLIE COBOS, MARK | ) | |
| ROBINSON, ANNETTE EMERSON | ) | |
| STEVE BRYANT, WORLD BOTANICAL | ) | Hon. Clark Waddoups |
| GARDENS, INC. (WBGI), | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## **OPPOSITION TO MOTION TO DISMISS**

Comes now plaintiff WALTER L. WAGNER, and as opposition to defendant WBGI's motion to dismiss, submits the accompanying *Memorandum of Law in Support of Opposition to Motion to Dismiss*, the accompanying *Affidavit of Walter L. Wagner in Support of Opposition to Motion to Dismiss*, the pleadings already filed herein, and on such other and further argument as may be presented at the hearing of this opposition.

DATED:     November 10, 2011

Walter L. Wagner

WALTER L. WAGNER
532 N 700 E
Payson, Utah 84651
retlawdad@hotmail.com
808-443-6344

FILED
U.S. DISTRICT COURT

2011 NOV 14  P 12: 33

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK


# UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| WALTER L. WAGNER, | Case:   2:11cv00784 |
| Plaintiff | **MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS** |
| vs. | |
| PRESTON MICHIE, KENNETH FRANCIK, LESLIE COBOS, MARK ROBINSON, ANNETTE EMERSON STEVE BRYANT, WORLD BOTANICAL GARDENS, INC. (WBGI), | Hon. Clark Waddoups |
| Defendants | |

## MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION
## TO MOTION TO DISMISS

### Introduction

Defendants appear to have a gross misapprehension as to the nature of *Res Judicata* and its applicability herein. While they cite very good case law, they consistently misapply it to the situation herein. *Res Judicata* is Latin for "a thing adjudged" and has been more freely translated as "a matter decided"[1]. Broadly speaking, *res judicata* is the generic term for a group of related concepts concerning the conclusive effects given final judgments[2], and is generally viewed as a common law or judicially created doctrine. The doctrine of *res judicata* is a principle of universal jurisprudence, forming a part of the legal systems of all civilized nations, and firmly entrenched in the law.[3]

### General Discussion

Within the general doctrine of *res judicata*, there are two principal categories or branches: (1) claim preclusion also known as *res judicata*; and (2) issue preclusion also known as collateral estoppel.[4] Fundamentally, under both

---

[1] *Hastings v. Rose Courts, Inc.*, 237 Ark. 426, 373 S.W.2d 583 (1963)

[2] *American Jurisprudence 2d*, Judgments, section 463

[3] *C.I.T. Corp. v. Turner*, 248 Miss. 517, 157 So.2d 648 (1963)

[4] *Mancuso v. Kinchla*, 60 Mass. App. Ct. 558, 806 N.E.2d 427 (2004); see also *American Jurisprudence 2d,* Judgments, section 464, Statement of Doctrine.

*res judicata* and collateral estoppel, a right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties or their privies. The principle that one who has actually litigated an issue should not be allowed to relitigate it underlies the rule of issue preclusion.[5]

Both res judicata and collateral estoppel serve the same purposes, which are to:

- Promote judicial economy and finality[6];

- Prevent repetitive litigation or multiplicity of suits[7];

- Prevent inconsistent results[8];

- Increase certainty[9].

Thus, the doctrine of *res judicata* is a manifestation of the recognition that endless litigation leads to confusion or chaos. It reflects the refusal of the law to tolerate a multiplicity of, or needless, litigation to the harassment and vexation of a party opponent.

---

[5]*Clark-Cowlitz Joint Operating Agency v. F.E.R.C.,* 826 F.2d 1074 (D.C. Cir. 1987)

[6] *Riemers v. Peters-Riemers*, 2004 N.D. 153, 684 N.W.2d 619 (N.D. 2004)

[7] *Bremer v. Weeks*, 104 Haw. 43, 85 P.3d 150 (2004)

[8] *Bremer v. Weeks, supra*

[9] *Riemers v. Peters-Riemers, supra*; see also *American Jurisprudence 2d*, Judgments, section 465

The doctrine of *res judicata*, with its companion, collateral estoppel, are founded upon principles of fundamental fairness. The doctrine of *res judicata* is not absolute; a court should not adhere to the doctrine where its application would work an injustice. Thus, situations may arise which call for exceptions to the application of the doctrine, such as where the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate the issue in the earlier case[10], such as is herein wherein plaintiff was denied trial litigation.

For purposes of issue or claim preclusion, <u>courts resolve all doubts in favor of permitting parties to have their day in court on the merits of a controversy.</u>[11]  This general principle is readily applicable to the false claims by defendants that the "very issues" were previously litigated, when clearly they were not, and only by the greatest stretch of imagination are they even linked.

Moreover, as was recently determined in the Utah courts, the application of collateral estoppel may be unwarranted in circumstances where its purposes would not be served, as herein, and its use may also be limited in situations where it would subvert other legitimate policy considerations.[12]

---

[10] *People v. Moore*, 138 Ill.2d 162, 149 Ill. Dec. 278, 561 N.E.2d 648 (1990); see also *American Jurisprudence 2d*, Judgments, section 470

[11] *Brigham Young University v. Tremco Consultants, Inc.*, 2005 UT 19, 110 P.3d 678, 197 Ed. Law Rep. 835 (Utah, 2005)

[12] *Gudmundson v. Del Ozone*, 2010 UT 33, 232 P.3d 1059 (Utah **2010**)

## Limitations on Operation

*Res Judicata* or claim preclusion bars a party from relitigating a matter that the party has already had the chance or opportunity to litigate.[13] Thus, *res judicata* or claim preclusion bars the litigation of not only the issues that were actually litigated, but also issues that could have been litigated, might have been litigated, or should have been litigated in the original suit or formal proceedings. In this respect, the recently arisen issues of defamation based on the recent (2011) e-mailings and web-site publications of defamatory material could not have been litigated in the prior suits as they were all concluded in 2008 or prior.

This effect on the limitation of operation was also again recently announced, wherein it is held that the party asserting *res judicata* must show that the previous litigation involved an identity of (1) the thing sued for, (2) the cause of action, (3) the persons and parties, and (4) the quality of the capacity of the person for or against whom the claim is made.[14]

If the cause of action in the second action arises after the rendition of the judgment in the first action, it is a <u>different cause of action</u> not barred by the

_____

[13] *American Jurisprudence 2d*, Judgments, section 473

[14] *In re Colony Beach and Tennis Club Ass'n, Inc.,* 423 B.R> 690 (Bankr. M.D. Fla. **2010**); see also *Bush v. City of Philadelphia Police Dept.,* 684 F. Supp. 2d 634 (E.D. Pa. **2010**)

prior judgment.[15]   In the application of the doctrine of *res judicata*, courts sometimes consider the identity of facts essential to the maintenance of both actions, or whether the same evidence would sustain both.[16]  If the same facts or evidence would sustain both, the two actions are considered to be on the same cause of action, within the rule that the judgment in the former is a bar to the subsequent action.  It has been said that <u>this method is the best and most accurate test</u> as to whether a former judgment is a bar in subsequent proceedings between the same parties, and it has <u>even been described as infallible</u>[17].  Of course, in applying this test, it is seen that about the only thing in common between the instant action, and the prior actions, is the commonality of the parties.   The defamatory emails of this past summer (2011) had not occurred, the defamatory publication on the internet of the dismissed "indictment" had not occurred, and the <u>substantive material of any of those defamatory actions were not known by plaintiff at the prior proceedings, nor discussed as factual matters at the prior proceedings.</u>

---

[15] *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 75 S. Ct. 865, 99 L. Ed. 1122 (1955)

[16] *Arnevik v. University of Minnesota Bd. Of Regents*, 642 N.W.2d 315, 163 Ed. Law Rep. 954 (Iowa 2002)

[17] *Bittner v. West Virginia-Pittsburgh Coal Co.,* 15 F.2d 652 (C.C.A. 4th Cir. 1926); *Thornbrough v. Barnhart*, 232 Ark. 862, 340 S.W.2d 569 (1960); *Jordan v. Stuart Creamery, Inc.,* 258 Iowa 1, 137 N.W.2d 259 (1965); see also *American Jurisprudence 2d*, Judgments, section 482

While the issuance by the State of Hawai'i of state-sanctioned action to issue an indictment did occur approximately two months prior to the last of those three civil actions being concluded, it was simply not discussed at that "trial" as an issue, and indeed, served as an operative event to preclude discussion of the facts surrounding its issuance by the removal of plaintiff and his wife from the "trial" courtroom. It was not until 3½ years later that its publication on the internet website was even discovered by plaintiff (as per the accompanying affidavit of Walter L. Wagner), in which defendants were attempting to give the false impression that the State of Hawai'i was still indicting plaintiff herein notwithstanding the dismissal by that State of that indictment, and that dismissal becoming final in 2010; apparently under their mistaken belief that once indicted, forever indicted and guilty, with their unfettered right to forever proclaim such 'guilt' notwithstanding the finality of the dismissal.

Moreover, the factual matters of the defamation were both not known, and not litigated, in the former actions. The criminal theft of the Visitor Center Account monies by one or more of the defendants herein was not known by plaintiff (though suspected later on), and the issue of whether that money was missing or not was never raised in any of the three civil actions, let alone the issue as to who stole it. The criminal deletions of shareholders from the WBGI

7

shareholder database was not known by plaintiff during any of the three prior actions, and the issue as to whether or not he or someone else was deleting shareholder names never came up in those three prior actions, and was simply not litigated because it was not known by plaintiff.

Likewise, the "indictment" was not even issued until after the conclusion of two of the prior civil actions, and several years after the filing of the third, in which it too was never litigated. Indeed, in the Nevada civil action, defendant Francik acknowledged in 2006 that he did not become president of WBGI until September 2, 2004, and if *res judicata* were to be applied, it would be to barring defendant Francik from claiming in later years (as he criminally did before the Hilo grand jury in 2008) that he and Emerson were voted in as officers in 2003. The issue before that Nevada court was whether or not Ron Tolman and his board properly became the Board of Directors in 2005 replacing defendants Francik and Michie and their board, not whether or not defendants Francik and Michie and their board became the Board of Directors in 2004, which all parties were agreed to as having occurred.

The fraudulent claims made by defendant Francik before that grand jury were never civilly litigated, and there are no valid findings of fact or conclusions of law asserting facts contrary to the Records maintained by the State of Nevada, the relevant one of which is the one from September 2, 2004 attached

8

as an *Exhibit* to plaintiff Wagner's supporting affidavit, with Francik and Emerson becoming officers in 2004. In that Record, defendants Francik and Emerson were voted in as WBGI officers on September 2, 2004 to replace plaintiff Wagner and his wife, NOT in 2003 as Francik fraudulently claimed to the Hilo grand jury.

More importantly, the issue is <u>not</u> who were the WBGI officers in 2003 or on September 2, 2004, issues that were never litigated in civil court. (They were litigated in that criminal action, and implicitly found in favor of plaintiff in that the "indictment" was dismissed. In that sense it is *res judicata* that defendant Francik lied to the Hilo grand jury, but he has not yet been charged with that act of perjury.) The <u>issue before this Court is whether or not, once an indictment was been dismissed as unsustainable, may a party who initiated the indictment forever thereafter publish and republish that indictment and present it to an audience as if it were still in effect?</u> Clearly, such action runs counter to the very fiber of our judicial system.

It is the false proclamation that a State action is continuing to charge a party with a felony, when such State action was found wanting and dismissed, that is actionable and defamatory; not the underlying claim made that gave rise to the charge. It is essentially irrelevant, so far as whether or not the claim is defamatory, for defendant Francik to falsely claim to a few people that his

9

presidency began in 2003, rather than 2004. It is the State action flowing therefrom, and wrongly promoted thereafter, that is defamatory.

### Limitation to Issues Actually Litigated and Determined

Parties will not be collaterally estopped unless the precise facts and issues were clearly determined in the prior judgment. Collateral estoppel or issue preclusion bars relitigation of issues that, in the prior action(s), were

- Actually litigated;
- Actually and necessarily litigated;
- Actually litigated and determined in the original action;
- Actually litigated, squarely addressed, and specifically decided[18].

Defendant relies heavily on the prior "judgment" of the Hawaii court, which "judgment" was entered following the removal of plaintiff herein and his wife from the courtroom, barring them from attending their own "trial" from which the "judgment" was issued. Defendant forgets to mention that little fact, which is the substantive basis of the pending appeal of that "judgment".

Moreover, the "judgment" of 'misappropriation of funds' was based on claims by defendants that funds spent by plaintiff (while serving as WBGI

---

[18] *Faulkner v. Caledonia County Fair Ass'n*, 869 A.2d 103 (Vt. 2004); *Richards v. Smith*, 9 Misc. 3d 670, 802 N.Y.S.2d 850 (Sup 2005*); People v. Ochoa*, 191 Cal. App. 4th 664, 2011 WL 9814 (2d Dist. **2011**); In re FedEx Ground Package System, Inc. Employment Practices Litigation, 712 F. Supp. 2d 776 (N.D. Ind. **2010**); see also *American Jurisprudence 2d*, Judgments, section 493

President) for provided housing (approximately $700/month valuation), for
medical insurance for his family, for legal fees under advice of legal counsel on
behalf of WBGI, for a provided work-truck (approximately $200/month valuation)
and insurance thereon (approximately $100/month) and other matters deemed
by defendants herein to be a "misappropriation" of funds, notwithstanding their
approval at that time by the prior WBGI Board, and well within the ambit of
acceptable corporate expenditures to entice workers to obtain employment with
a company, were "misappropriations". Because plaintiff herein was not able to
attend the "trial", the explanation for the reasons of the appropriations he had
made, characterized by defendants herein as "misappropriations", was not
made at the "trial", and hence their one-sided version was typed up by them
following the "trial" and presented to that trial court judge for his signature.

That gross misconduct and dirty tricks that they used to prevent actual
litigation of the issues they raised regarding alleged 'misappropriation' hardly fits
the standard referenced above.     Moreover, a 'misappropriation' is not
necessarily illegal. It is simply money spent in which others, not having all of
the facts, might conclude was not wisely spent, and might or might not be
actionable. That was the issue that was 'raised' in the prior 'litigation' at the
"trial" plaintiff Wagner was barred from. Neither the issue of money being stolen
from the Visitor Center Account, nor who stole that money, was ever raised and

11

litigated in any of the prior litigations, because plaintiff did not know about that theft at that time (or he likely would have raised it). (See the affidavit of Walter L. Wagner accompanying this memorandum of law regarding issues raised at the prior litigations.)

That issue of 'misappropriation' is a far cry from the current false claim being made by defendant Michie to Mr. Louis Pratt that plaintiff Wagner never opened the Visitor Center Account with the monies sent in specifically to him for that account by WBGI shareholders, and instead stole the money, a criminal act if true. They are, simply put, not the same issue. And in order for issue preclusion to be operative, the issues must be identical, which they are not. And moreover, there must have been a fair opportunity to have litigated that prior identical issue. Not only is the issue not identical, there was no opportunity to litigate the issue of misappropriations, in the usual sense of the word, due once again to the criminal activity of defendant Francik who sought to prevent that litigation and the facts from being placed on the public record, by causing the wrongful arrest and removal from the courtroom of plaintiff and his wife at that prior Hawaii alleged 'litigation' ("trial").

And while plaintiff might prove to be vexatious towards that Hawaii judge who engaged in collusion with the criminality of defendant Francik, that is essentially irrelevant to the claim at hand. If that judge does not like plaintiff

12

bringing the judge's collusion with defendant Francik to the attention of the appellate court, he shouldn't have engaged in that collusion in the first instance.

This is in alignment with the general rule that "*the judgment in the former action operates as an estoppel only as to matters which were necessarily involved and determined in the former action and is not conclusive as to matters which were immaterial or unessential to the determination of the prior action, were not issuable in the first action, were germane to, implied in, or essentially connected with, the actual issues in the case, or were not necessary to uphold the judgment.*"[19]

Not only was the theft by one or more of the defendants of the Visitor Center Account funds not known by plaintiff herein at that time and necessarily not litigated in any of the prior actions, the finding of 'misappropriation' of other monies by plaintiff, at a "trial" he was precluded from attending, is not germane or necessarily connected to the issue of who stole the Visitor Center Account funds, and hence the false claim by defendant Michie that plaintiff was the party responsible for that Visitor Center Account theft, as an effort to cover-up that theft by one or more of the defendants so as to keep the shareholders from learning of the defendants' culpability, is indeed actionable defamation.

_____

[19] *American Jurisprudence 2d*, Judgments, section 498

In like manner, the criminal deletion of shareholders from the Shareholder data-base was not known by plaintiff Wagner during the prior litigations, and not referenced in any prior judgments. Alleged poor financial record keeping might constitute a tort. Deliberate or negligent deletion of shareholders from the database is a criminal act under securities regulations. Of necessity, the focus of the Nevada trial was on the governance issue, and not on quality of record-keeping by plaintiff herein, which was tangential. That Nevada complaint itself squarely framed the issues, and deletion of shareholders from the database was never referenced in that complaint, nor in any of the pleadings filed therein, nor in the judgment rendered. Accordingly, the issue of deletion of shareholders from the database was never litigated, and the false claim made by defendants to cover-up that criminal activity, by wrongly asserting that plaintiff was responsible for the deletions, becomes an act of actionable defamation.

Finally, the defendants essentially make the fraudulent claim, by their republication on their internet website for the WBGI shareholders to see, that the "indictment" they obtained against plaintiff herein by their criminal fraud before the Hilo grand jury was validly issued and is currently being charged. They are in essence telling the WBGI shareholders that plaintiff herein committed the felonies of "attempted theft" and "identity theft" and that the State of Hawai'i is continuing to indict him and charge him with those crimes.

14

Defendants are now telling this Court that that is acceptable behavior and non-actionable, and that plaintiff cannot seek injunctive relief or other redress for the grievance, nor obtain a court order to have it removed from their website.

But once again, *res judicata* can only be brought into play to confirm the dismissal of that "indictment", in that the State of Hawai'i, by and through the office of the prosecuting attorney, allowed for the dismissal to become final by not appealing same. It is forever dismissed, and has the same operative effect as if never charged, with the one major difference being that double jeopardy precludes it from ever being wrongly charged again.

The issuance of that criminal charge was never litigated in any of the prior civil actions. It was litigated in the actual criminal case, and found in favor of plaintiff, and accordingly defendants are estopped from asserting that there is any validity to that "indictment". That is the operative effect of *res judicata* in this matter. Defendants are to be held to the standards applicable to all, and while they might be privileged to wrongly assert that they created the heavens and the earth, and all things thereon, they are not privileged to assert that the State of Hawai'l is continuing to prosecute plaintiff Wagner, or that that "indictment" in any manner sets forth valid criminal charges. The conclusive evidence is the actual dismissal of that "indictment", coupled with the State of Nevada records showing that the Wagners were the WBGI officers at the time

15

Francik fraudulently claimed to the Hawai'i authorities that he and defendant Emerson were those officers, giving rise to that "indictment". There is no privilege whatsoever to falsely claim that that issue was litigated in the prior civil actions and found in defendants' favor – it was not. Rather, it was found that there was no merit to the "indictment" and that the State of Hawai'i was accordingly discontinuing its prosecution. That discontinuation of prosecution occurred more than one year ago, and the continuing publication of that "indictment" thereafter by defendants on their website is constructive defamation, designed specifically to place plaintiff in a false light and make it appear as if he were guilty of felonies and that the State of Hawai'i was continuing their prosecution of him. Plaintiff is entitled to injunctive relief to have it removed in that this court has full subject matter jurisdiction thereon.

Further Explanation of Defendants' Misconduct

This honorable Court should not be swayed by the great scam the defendants are continuing to perpetuate, now before this Court. The Hawai'i Court was presented with an amalgam of false claims of misappropriation of funds by plaintiff. They were never litigated, of course, because plaintiff was barred from the "trial", which is now an appellate issue as to the unlawful barring of plaintiff from that "trial". But in essence, that amalgam of claims never had the claim of theft of the Visitor Center Account monies.

Rather, as noted in the accompanying affidavit in support, the amalgam of claims of misappropriation is seen to be wholly appropriate activity for a corporate officer. That 'finding' reads that plaintiff herein and his wife "*diverted WBGI funds to their personal purposes. These included funds for the Wagner's personal mortgage, property tax payments and personal credit card payments and for debts incurred to creditors for personal expenditures.*"[20]

This is but more of defendants' false characterization of plaintiff Wagner as someone who was 'misappropriating' from WBGI, when in fact they are the persons who are stealing. It is to be noted that the theft of the Visitor Center Account monies is not mentioned, leading plaintiff to believe it had not been stolen by defendant(s) at that time, even though plaintiff Wagner was not able to appear at that "trial" and give evidence regarding those alleged 'misappropriations' discussed below.

As is detailed in the accompanying affidavit, the monies spent by plaintiff as WBGI president, and many years later characterized as "misappropriations" at that "trial", were in fact valid and appropriate expenditures as follows:

- alleged 'mortgage payment' and property tax payment was rent for housing paid to numerous landlords over nine years for roughly $700/month, and was a condition of employment of plaintiff in lieu of a higher salary, and because he was not being paid his salary at that time;

---

[20] Quoted from defendants' memorandum in support of motion to dismiss, page 11, middle of page.

- alleged 'personal credit card payments' were for payments made on plaintiff's personal credit cards[21] which he loaned to WBGI, and which were used for WBGI business with minor exceptions. Those minor exceptions were allowed by the contract loaning the credit cards. Those usages were appropriately credited as partial payment of his uncollected salary, reducing the amount claimed in *Wagner v. WBGI*, the first Hawai'i civil suit seeking plaintiff's back-pay. A full accounting thereof was kept for that purpose.
- Alleged 'debts incurred to creditors for personal expenditures' is a catchall for various other obligations incurred by plaintiff Wagner and mischaracterized as "personal", which included monies loaned to other entities (and secured by him personally), monies advanced under advice of legal counsel for WBGI legal work or to protect WBGI interests, and other mischaracterized monies for purchases used for WBGI, such as food used for Christmas Baskets for employees, etc. wrongly characterized as personal expenditures for food for plaintiff.

However, because plaintiff Wagner was barred from that civil "trial", he was never able to present that evidence. Again, nowhere had it then been claimed that the Visitor Center Account monies were missing or stolen, and no evidence was given thereon at that "trial" or anywhere else in prior litigations.

<u>Summary Regarding Defamation Actions</u>

Plaintiff Wagner has not brought suit seeking a defamation action against defendant Francik for claiming that he, not plaintiff Wagner, was the President of WBGI in 2003. No one gives a hoot who was president of WBGI eight years ago, and such a claim by him now would be barely defamatory, in and of itself.

---

[21] Defendant WBGI is also currently a defendant in another civil action by one of those credit card companies seeking their money back, pending in Utah as #100106166.

Plaintiff Wagner is bringing suit to have the fraudulently obtained "indictment" removed from the WBGI website, as it is the "indictment" document itself, not the underlying false claim that gave rise to it, which is defamatory. It is defamatory not because it implicitly asserts that defendant Francik was WBGI President since 2003, rather than since September 2, 2004 as is actually the case. Indeed, even a careful reading of the "indictment" does not even reveal what the underlying facts giving rise to it are.

Rather, the "indictment" is defamatory because it wrongly asserts that the State of Hawai'i has evidence that plaintiff Wagner committed two specific felonies ("attempted theft" and "identity theft") and is prosecuting him for such, when the State of Hawai'i has no such evidence and is not now prosecuting him. Accordingly, this Court has ample subject matter jurisdiction to order the removal of that and its related defamatory materials from the WBGI website.

The theft of the Visitor Center Account funds is a serious felony. The WBGI shareholders mailed their monies to plaintiff Wagner at the WBGI office for deposit into that account, and in fact plaintiff Wagner caused those monies to be deposited into that account. To characterize those facts instead as a theft of those monies, by asserting that that account was never opened, and that plaintiff Wagner stole the money, is a serious act of defamation wrongly asserting that plaintiff Wagner committed a felony theft of those monies. It is

19

even more serious because it was done to cover up theft from that dedicated
Visitor Center Account by one or more of the defendants.

In essence, the argument now made by defendants is that because of the
"judgment" obtained against plaintiff by their collusion with the trial court to have
him removed and prevented from presenting his own testimony at that "trial", or
the testimony of his wife, and prevented from cross-examining witnesses, etc.,
he is forever barred from complaining if they make claims or assertions that he
engaged in felony theft of WBGI monies, and that they have *carte blanche* to
defame him whenever they choose, to whomever they choose, by whatever
means they choose, as a means of covering up their own criminal activity.

### Plaintiff's Tort Fraud Claim

Defendants mischaracterize plaintiff Wagner's claim for monetary
damages based upon the fraudulent sale of his shares as a 'fraud, waste and
mismanagement' claim, asserting he lacks standing as no longer being a WBGI
shareholder.

In fact, it is a tort claim for monetary damages based upon the fraudulent
sale of his shares at far below the then value assigned to the shares, for which
he does have standing in that the responsive pleading filed herein is *prima facie*
evidence of this Court's *in personam* jurisdiction over the defendant WBGI. In

20

that the claim is a tort claim under state law, this Court generally also has *in rem* jurisdiction over state tort claims, absent statutory abrogation.

To summarize the basis of the claim: Defendant WBGI obtained an order from the Nevada court allowing the sale of plaintiff Wagner's share ownership in WBGI to satisfy the monetary judgment issued against him by that court (notwithstanding the prior agreement between the parties that monetary judgments would not be entered in the Nevada case). In order to facilitate their sale, defendants constructed a purported 'public auction' in which they would sell his shares to the highest bidder, which was not advertised in advance to the WBGI shareholders, nor to the public.

At the 'public auction' there was only a single 'bidder', and plaintiff Wagner's shares were sold in blocks for the minimum starting 'bid' of $10/share. That "auction" was conducted in June 2007. Previously, the shares had sold at $520/share to private parties in 2005, and they had always had a high share value for the prior decade of $200/share or higher, including in the range of $400-$500/share for the prior half-decade.

Then, later in 2007 after the June 2007 'public auction', defendant WBGI advertised plaintiff Wagner's shares for sale to the WBGI shareholders at $250/share, which was their true value at that time. Apparently, due to the fraud, waste and mismanagement of defendants between 2004 and 2007, the

share value had steadily deteriorated from the high of $520/share in January 2005 (at the conclusion of plaintiff Wagner's tenure with WBGI) to $250/share in late 2007.

The value of $250/share (or higher) was already known to defendants at the time they sold plaintiff Wagner's shares to the 'bidder' at $10/share. The bidder was actually WBGI itself for some of plaintiff's shares (returning them to the treasury), and one of the members of the Board of Directors for others (increasing that individual's personal share ownership). Notwithstanding two parties being present at the 'auction' (a WBGI representative, and a representative for that Board member), there was never more than one 'bid' for plaintiff Wagner's shares, and no actual auction.

This sale of plaintiff Wagner's shares internally to WBGI and/or one of its board members, at a value far below the known value, was a fraud.

Consequently, defendant WBGI now claims that they had to sell all of plaintiff Wagner's shares, at that exceptionally low value, in order to recover the 'damages' they were wrongly awarded by that Nevada judgment, and accordingly plaintiff Wagner is now no longer a shareholder of WBGI, according to defendants.

The tort claim filed herein pertains to that fraud. Defendant WBGI conducted a sham 'auction' knowing that no parties other than they themselves

22

would be able to participate, and knowing that the $10/share selling price was far below their actual value, which they knew at that time to be at $250/share or higher.

Plaintiff Wagner did not learn of that fraud until this past summer (2011) when he read in private WBGI newsletters he had not previously been privy to that his shares had, following the "auction", thereafter been advertised and sold to other WBGI shareholders at $250/share a few months after that "auction".

Based on that share valuation at $250/share, plaintiff's share ownership was more than enough to satisfy that Nevada judgment, leaving him with continuing share ownership.

The fact that plaintiff Wagner has an offset against that Nevada judgment of approximately $750,000, based on his pending suit in Hawaii for back-pay, etc., means that WBGI *ab initio* had no right to sell any of his shares, as that pending Hawaii judgment is for a value of approximately $400,000 greater than the Nevada judgment that was wrongly entered.

Plaintiff's Request for a Receiver

Plaintiff is also requesting injunctive relief for appointment of a Receiver, in addition to the injunctive relief relating to defendants' acts of defamation.

While plaintiff agrees with defendant that Nevada state courts also have concurrent jurisdiction to appoint a Receiver pursuant to Nevada corporate law

23

[Nevada Revised Statutes (NRS) 78.630 *et seq.*], this is not exclusive jurisdiction if a federal court has obtained *in personam* jurisdiction relating to the parties and subject matter, as this Court has.

While certainly the existing evidences of frauds by defendants should be sufficient to warrant appointment of a Receiver, plaintiff seeks to augment the record with the other extensive frauds, wastes and mismanagements not presently detailed, before conducting a hearing on a motion for appointment of a Receiver.    Such augmentation would include evidence of the waste of approximately $4,000,000 of shareholder investment capital, leaving them with only 10% of the original land ownership obtained by plaintiff for WBGI, valued on their books at approximately $350,000 and on which they have placed their own personal liens exceeding $500,000; waste of the garden resources including wholesale uprooting of palms and other valuable plants and sale thereof at far below their actual value, etc.  This pleading is not the proper place for presenting that evidence, and it will instead be presented by way of numerous sworn affidavits from various WBGI shareholders at a later time.

NRS 78.630 and NRS 78.650 both authorize a court to appoint a Receiver when malfeasance on the part of the corporate governance is evidenced.  They both specifically allow that shareholders or creditors may bring suit in state court for appointment of a Receiver.

Title 28, United States Code (USC), section 1332 is the enabling statute

that allows for diversity jurisdiction, as herein, and reads in pertinent part:

> "*(a) The district courts shall have original jurisdiction*
> *of __all__ civil actions where the matter in controversy*
> *exceeds the sum or value of $75,000, exclusive of*
> *interest and costs, and is between –*
> *(1) citizens of different States;*"
> (**bold __underlining__** added for emphasis)

Nevada's NRS sections 78.630 and 78.650 both enable shareholders or

creditors to confer jurisdiction on the courts for redress of grievances and

appointment of a Receiver to protect their interests.  In the instant matter, this

Court has already obtained jurisdiction over the parties.  Accordingly, this court

has jurisdiction "of all civil actions" between those parties.  The applicable law to

be applied is Nevada state statutory law pertaining to corporations, when this

Court is requested at a subsequent hearing to appoint a Receiver, which

appointment is not requested at the initial hearing on the motion for a

preliminary injunction to remove the fraudulent, libelous defamations from the

defendant's website.  Because of the voluminous nature of the other frauds

worked by defendants, plaintiff chooses initially to focus on the removal of the

defamation from the defendant's website, and will then follow-up with the

Receiver appointment request by way of a second motion for injunctive relief.

## Conclusion

It should be readily apparent that the defendant's have the attitude that they can do no wrong, and that they have the right to engage in clearly defamatory activity for no valid purpose, simply because they believe they can get away with it. They believe they have the right to continually defame plaintiff in whatever manner they wish, for as long as they wish, merely because they fraudulently obtained a judgment in Hawaii by use of their criminal activity before the Hilo grand jury, resulting temporarily in the issuance of an "indictment" naming plaintiff, which fraudulent civil activity is currently on appeal.

Under such circumstances, it is respectfully requested that this Court deny defendants' motion to dismiss and grant plaintiff's motion to remove that fraudulently obtained "indictment" from defendant WBGI's website.

It is further requested that this Court issue an injunctive order precluding defendants from asserting or otherwise claiming that plaintiff Wagner removed, misappropriated, stole, or otherwise took any of the Visitor Center Account monies from that Visitor Center Account, or from denying that that Account was ever set up or claiming that plaintiff Wagner never placed the monies into that account that he was sent by the WBGI shareholders for placement into it.

It is further requested that this Court issue an injunctive order precluding defendants from asserting or otherwise claiming that plaintiff Wagner deleted shareholder names from the WBGI shareholder data-base, or that any omissions or deletions therefrom were occasioned by plaintiff Wagner.

It is further requested that this Court direct defendant WBGI or its counsel to provide to plaintiff the current addresses of the other named defendants, so that plaintiff Wagner may effect service of process on the other named defendants.

It is further requested that this Court set a hearing date in the near future to determine whether one or more of defendants' Directors should be removed from defendant's Board of Directors pursuant to NRS sections 78.630 *et seq.*

DATED:     November 11, 2011


Walter L. Wagner

27