WALTER L. WAGNER
532 N 700 E
Payson, Utah 84651
retlawdad@hotmail.com
808-443-6344

FILED
U.S. DISTRICT COURT

2011 NOV 30  P 1: 59

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| WALTER L. WAGNER, ) | Case:   2:11cv00784 |
| ) | |
| Plaintiff ) | **RESPONSE TO "*DEFENDANT** |
| ) | ***WORLD BOTANICAL GARDENS*** |
| vs. ) | ***INC.'S MEMORANDUM IN*** |
| ) | ***OPPOSITION TO PLAINTIFF'S*** |
| PRESTON MICHIE, KENNETH ) | ***MOTION FOR PRELIMINARY*** |
| FRANCIK, LESLIE COBOS, MARK ) | ***INJUNCTIVE RELIEF*"** |
| ROBINSON, ANNETTE EMERSON ) | |
| STEVE BRYANT, WORLD BOTANICAL ) | |
| GARDENS, INC. (WBGI), ) | |
| ) | Hon. Clark Waddoups/Trial |
| Defendants ) | Hon.  Paul Warner/Pre-Trial |
| ) | |

**RESPONSE TO "***DEFENDANT WORLD BOTANICAL GARDENS INC.'S*
*MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR*
*PRELIMINARY INJUNCTIVE RELIEF***"**

COMES NOW PLAINTIFF WALTER L. WAGNER and respectfully responds to defendant WBGI's opposition to preliminary injunctive relief:

I

## DEFENDANTS CHRONICALLY MISREPRESENT THE COMPLAINT

The complaint is NOT a restatement of claims and issues previously litigated, though defendants would like this Court to believe so. Rather, the complaint sets forth acts of defamation that recently took place, through and to this past summer (2011), and one act of fraud that took place in 2006 and which plaintiff recently learned about this past summer as being a fraud. To summarize, the recent acts of defamation and recently discovered fraud are:

1) Publishing this past summer (2011) of a DISMISSED "indictment" on their website to plaintiff's business associates, (which indictment they had previously obtained against plaintiff by the criminal fraud of lying to a grand jury), more than one year AFTER the "indictment" was dismissed, presenting it to plaintiff's business associates as if it were true and currently being prosecuted against plaintiff, when in fact it had been dismissed for more than one year. This was designed specifically to place plaintiff in the false light of being someone who had engaged in "attempted theft and identity theft" and that the State of

2

Hawai'i was currently prosecuting him for such, when in fact no such events ever occurred, and the wrongful prosecution therefore had terminated more than one year earlier.

2)    Emailing and orally transmitting this past summer (2011), to numerous business associates of plaintiff, the fraudulent claim that plaintiff had never opened up a Visitor Center account as he had several years earlier promised his business associates would happen, and that he had instead embezzled the monies that had been sent in to him for opening that account. This fraudulent allegation of theft of funds, operating hand-in-hand with their fraudulent allegation of "attempted theft and identity theft" which they placed on their website via the dismissed "indictment" being presented as true and pending, is a clear form of defamation designed specifically to place plaintiff in a false light. Moreover, it was also designed to cover-up the fact that the embezzlement of those Visitor Center funds was occasioned by the defendants, apparently under the mistaken belief that plaintiff would not learn of that particular email and their false claims against him would effectively keep his associates from having any further business dealings or contacts with him.

3)    Emailing and orally transmitting this past summer (2011), to numerous business associates of plaintiff, the false claim that he had deleted shareholders from the SEC required shareholder database, when the deletions

3

were occasioned entirely by defendants, and plaintiff had kept accurate, complete, and up-to-date records of the entire body of shareholders. This claim of criminal negligence on his part, when in fact the criminal negligence is on the part of the current Board of Directors, or the defendants, or both, was likewise designed to place plaintiff in a false light with his business associates to dissuade them from further business with him.

4)   The state tort of a fraudulent sale of his shares of ownership in WBGI by defendants herein.   While this indeed supports a separate request for injunctive relief to appoint a receiver due to waste, fraud and mismanagement (as do the other torts), that request is not presently before this Court with the pending motion.  The state tort fraud is a serious tort involving the defendants and their fraudulent decision to sell off all of plaintiff's shares of ownership in WBGI at low price.  They did so at a price they knew at the time was far below the market value and far below what they could obtain if they sold them to the other WBGI shareholders.  They did this under the auspices of 'court supervision' without ever telling the court that they knew the shares were valued at $250/share and they would subsequently be selling them for that price to the shareholders.   Only this past summer 2011 did plaintiff learn that the sale was a fraud.  He learned this past summer, during a brief window of time in which he was able to obtain access to the WBGI shareholder website, that defendants

4

already had plans in place to sell plaintiff's shares to the other shareholders at $250/share, while at the same time telling the state court judge in Nevada that they could only get $10/share for them at a "public auction". They continued to sell plaintiff's shares at $250/share to the other shareholders for more than one year thereafter.

All of the above torts are extremely serious matters involving clear evidence of intent to harm plaintiff. Indeed, they appear highly vindictive.

II

## DEFENDANTS ACKNOWLEDGE VALIDITY OF COMPLAINT

Defendants announce through their opposition[1] that they are now removing the "indictment" from their website because it is wrong of them to have placed it there in the first place, and that WBGI has recently "*informed its shareholders that there were no longer criminal charges pending against Plaintiff*".

This recent conduct, if true, does simplify the Court's analysis. Defendants have acknowledged the wrongfulness of presenting that false information to the WBGI shareholders, which is the tort of defamation. They have not discussed what they believe is a proper damage remedy for having left it there for likely a

---

[1] POINT 1, page "3" of *Defendant World Botanical Garden Inc.'s Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction*: **NOTA BENE**: Because of a numbering problem on their opposition, this is actually the NINTH page of their document, incorrectly labeled as page "3".

full year or longer, which is now the damages decision with respect to that particular tort to be decided by the jury. The decision of whether to place a 'Corrective' on the website, and for how long to place it there in order to mitigate the damages they caused, as proposed by plaintiff, remains for this Court to decide.

Moreover, this acknowledgment on the part of defendant that they have engaged in that tort shows that their pending motion to dismiss is unfounded. If there is a viable cause of action, the case cannot be dismissed.

III

## DEFENDANTS PRESENT NO ADDITIONAL FACTS

In lieu of providing additional facts by way of sworn affidavit of any of the defendants or others, defendants rely solely on civil judgments that are currently under appeal, as support for some of their factual claims. Contrarily, plaintiff has provided three sworn affidavits from three knowledgeable WBGI shareholders in support. It should be pointed out, once again, that the civil "judgment" relied upon by plaintiff for some of its factual assertions was obtained by the fraud of defendants in having plaintiff and his wife removed from the civil "trial", precluding them from litigating those allegations of 'fact'. They rely upon

6

supposed 'contradictions'[2] in which plaintiff alternatively asserted that he was employed by WBGI (he was, as an independent contractor for 9 years, with a contract subject to termination at will by the Board) and that he was an independent contractor. Both of those statements are true, as contractors are considered employees under many definitions of the term. For nine years, plaintiff lived and worked in Hawai'i, at the WBGI site, under an independent contractor contract. He could and did truthfully tell people he was employed by WBGI, hence an "employee" of WBGI, without going into the details that the employment was under an independent contractor agreement. Defendants, in their fraudulent Hawai'i actions, have sought to claim that slight difference in terminology as to how he would refer to the work he did means that those Promissory Notes were 'fraudulent' and they are therefore free to attack him, and no longer owe him for the work he did. This is utterly bogus. But it does explain their obvious malice.

IV

## THEFT OF VISITOR CENTER FUNDS BY DEFENDANTS

Defendants refer to the two bank accounts that were extant for WBGI in 2004, calling them *Account A* and *Account B.* Using that terminology, *Account A* was the corporate General Operating Account at Bank of Hawai'i, opened by

---

[2] Top of page "7", first paragraph: *Nota Bene,* this is actually the THIRTEENTH page of the opposition

Case 2:11-cv-00784-CW-PMW Document 20 Filed 11/30/11 Page 8 of 18

plaintiff *circa* 1995 for which plaintiff was the sole company signatory until 2003, after which he discontinued spending from that account. Likewise, *Account B* was the dedicated corporate Visitor Center Account, which plaintiff assisted in opening at the Bank of Hawai'i but over which he had zero control, as he was not an authorized signatory on the account.

*Account A* derived its funds from a variety of sources, primarily tourism (entrance admissions, sales, etc.) and investment from new shareholders.

*Account B* derived its funds from a single type of source, namely investment from existing WBGI shareholders. These were shareholders who were promised in writing, by defendants, that their monies would be spent solely on construction of a visitor center if they would invest further beyond their original investment. They were instructed to mail their checks to the plaintiff, and he would deposit them into that dedicated *Account B*, and not into the *Account A* (general operating account). In 2004, plaintiff in fact oversaw the deposit into *Account B* of approximately $220,000 that existing WBGI shareholders mailed to him at the WBGI office for deposit, or to others at the WBGI office for deposit.

These shareholders are not entirely forgetful. Seven years later at least one of them wrote to defendant Bryant inquiring what became of those monies that were mailed in for plaintiff to deposit into *Account B*, in light of the fact that they were never used for construction of a Visitor Center as intended and

8

promised. In response, defendant Michie wrote back, on behalf of defendant Bryant, that plaintiff Wagner had never opened that *Account B* as he had said would be the case, and instead "misappropriated" the money. The only rational conclusion to draw from that assertion was that plaintiff Wagner had embezzled the monies, a felony. Yet this account was opened several months before Mr. Michie was on the Board of Directors, and announced by his Board as being in existence (in a newsletter in late 2004). He certainly was aware of the *Account B,* and the theft of the monies from it. Accordingly, he knowingly defamed plaintiff in an effort to place the blame for that theft on plaintiff, rather than on some of the defendants who are entirely responsible for that theft.

Defendants did indeed present false claims to the Hawai'i court of 'misappropriation of funds' by plaintiff for his usage of *Account A* during his tenure as President of WBGI. They did so at the sham "trial" in which they had plaintiff and his wife removed from the courtroom based on their fraudulently obtained "indictment". Yet now they wish to claim the fruits of that fraud as being 'issue preclusion' for an issue supposedly previously litigated. Nowhere was the *Account B* fund (Visitor Center Account) litigated. Nowhere was the theft of the monies from that fund litigated. Nowhere was the identity of who stole the *Account B* funds litigated. Yet now defendant wishes to claim 'issue preclusion' because the allegation of misappropriation of the *Account A* funds at a sham

9

"trial" should serve to allow defendants to make any claims of theft by plaintiff Wagner from the *Account B* funds that they wish to wrongly propagate, even though they are entirely different accounts, with entirely different circumstances surrounding the usages of those monies.

This entire situation is very reminiscent of Tonya Harding, who arranged to eliminate her skating competition by having Nancy Kerrigan whacked in the knee with a club. It worked. Nancy Kerrigan was sidelined, allowing Tonya Harding to enter the "arena of competition" with her competition eliminated.

Here, defendants whacked plaintiff Wagner and his wife in the knee by having them arrested at the "trial", thereby eliminating the competition of the truth being presented, allowing defendants herein to be in the courtroom arena presenting only their fraudulent version of events without any competition from the truth.

The difference is that Nancy Kerrigan was only whacked once.

Here, defendants took another whack at plaintiff when they published on their webpage the dismissed "indictment" they had obtained by fraud, as well as the "judgment" they obtained by their first whack at the sham "trial". Then they took yet another whack at plaintiff when they claimed he embezzled the Visitor Account (*Account B*) funds, directing unknown numbers of shareholders to the utterly false impression that plaintiff had engaged in some sort of looting spree.

10

Yet defendants now claim that they should continue to be allowed to publish the fraudulently obtained "judgment", which is under appeal, which for years stood alongside the fraudulently obtained "indictment", which they now claim to have removed from their website.  The publication of the fraudulent "indictment" was done to buttress the false allegations of the civil "judgment" they obtained at their sham "trial".  That "judgment" is as fraudulent as was the "indictment", hence the pending civil appeal.  It contains no truth, and the allegations of "misappropriation" are fraudulent.

This Court need only look to the history of conduct of the defendants, as evidenced by the sworn affidavits on file herein, and not countered by any other evidence or affidavits, to recognize the depth of malice to which they have succumbed.  Certainly other shareholders (other than those filing affidavits to-date) also believe plaintiff, because what he states is consistent and true.  The same cannot be said for the self-serving frauds and publications of the defendants.  They cannot be allowed to continue to publish falsehoods on their website, in the guise of "judgments", to attempt to sway shareholders into believing falsehoods about plaintiff, the company founder.  This serves no legitimate corporate purpose, and continues to work a fraud on the shareholders.

11

V

## ISSUANCE OF INJUNCTIVE RELIEF PROPER

Defendants have in essence conceded the lack of merit in their motion to dismiss. On page 11[3] of their opposition, bottom of section 2, they state: "*The availability of an adequate remedy* [for their publication of the "indictment" after it was dismissed] *in the form of monetary damages precludes the issuance of a preliminary injunction in favor of Plaintiff*".

While certainly plaintiff Wagner does have that remedy, **monetary damages for the harm they have caused him**, it is <u>not</u> an adequate remedy, nor the only remedy available. As is well-noted in plaintiff's Memorandum of Law, publication of false legal pleadings is readily enjoinable.

Defendants proclaim that a "*threatened injury to movant outweighs injury to nonmovant*"[4]. <u>This is true.</u> They have it backwards in the argument that follows that proclamation. Following that proclamation, they then argue that, as the nonmoving party, they would be injured if they were required to remove the pending "judgments" and other legal documents of their own drafting that they obtained by whacking plaintiff in the knee. They claim that the shareholders have a right to know the "truth".

---

[3] This is actually the 17th page of their opposition document, labeled as page '11'.

[4] Page 11 of their opposition, which is actually the 17th page of their opposition document.

Indeed, they do. The shareholders have the right to know that the "judgments" were obtained by defendants' fraud and their whacking plaintiff and his wife in the knee, and that the "judgments" are being reversed on appeal; the shareholders have the right to know that some of the defendants were the persons who embezzled the Visitor Center Account (*Account B*) monies, not the plaintiff; the shareholders have the right to know that the allegations of "misappropriation" are pure fictional concoction on the part of defendants designed to preclude plaintiff from collecting on his extensive back-pay he loaned to defendant WBGI (which judgment against WBGI is also pending in the appellate courts in Hawaii). Yet plaintiff is not asking this Court, at this time, to place those corrections on the WBGI website. He is merely asking that it be left as a neutral ground, with no publication of documents that were obtained by overt fraud or for which legal actions are still pending, coupled with the removal of the dismissed "indictment" which has been finalized in plaintiff's favor, and placement of the "Corrective" to correct the false impression already conveyed.

The proposed "Corrective" plaintiff has submitted to replace the "legal pleadings" section of the WBGI website is designed solely to eliminate the false impressions created by defendants with those documents, which have no valid purpose on any corporate website. It is not designed to set the record straight on

all of the extensive frauds, knee-whackings, etc. by defendants.   That might

come later.

Because defendants attempt to make much of their claims of

"misappropriation of funds" by plaintiff, as alleged in their "judgment" obtained by

their knee-whacking, summarized as an appendix hereto is a more complete

explanation that those appropriations of funds by plaintiff, while serving as WBGI

President, were fully appropriate, Board authorized, and in the best interests of

WBGI, and were not an "embezzlement" of funds as now claimed by Mr. Holden.

VI

## CONCLUSION

This Court need only look at the long and sordid history of misconduct on

the part of defendants to recognize the need for injunctive relief.   Merely

removing the "indictment" from the website, at this late date, voluntarily by

defendants (if it is true, and it is not certain that it is true), without issuance of

injunctive relief, will allow them at some later date to simply place it back again.

They have no respect whatsoever for the rights of plaintiff, and will continue

to abuse his rights if this Court does not enjoin them.   The "Corrective" will work

towards reducing the false impressions previously conveyed by defendants to

plaintiff's business associates.   Because of the lengthy period of time that the

14

fraudulently obtained "indictment" was in place on their website, the "Corrective"

likewise needs to be in place for a suitable period of time.

DATED:     November 29, 2011


Walter L. Wagner

APPENDIX

Explanations of Appropriations Not Presented at the Hawaii "Trial" which were
Falsely Characterized as "Misappropriations"

Various types of appropriations were made by plaintiff Wagner serving as the
WBGI President from 1995 to 2003, totaling approximately $4,000,000. A few of
these were characterized as "misappropriations" by defendants herein at a "trial"
that plaintiff was precluded from attending by defendants' knee-whacking of
plaintiff, sidelining plaintiff from the "trial". The correct explanations, and how
they were appropriate corporate expenditures, follows in abbreviated version
below. All of the expenditures were approved by the then-current Board of
Directors, as well as several other advisors, lawyers, etc.:

- Health Insurance Appropriations. Hawaii law requires persons employed
  by a company to be provided health insurance by the company. Plaintiff
  obtained a policy that covered not only himself, but his family. Defendants
  herein proclaimed that was a "misappropriation" of corporate funds to cover
  his family in addition to himself. It was a Board approved appropriation,
  and a common type of corporate expenditure well within the ambit of what
  corporations may provide to their workers. Defendants herein sought
  'repayment' from plaintiff of those insurance payments made to a third
  party.

- Housing Appropriations. WBGI began providing Board-approved housing
  to plaintiff in January 1995, which continued until late 2003, by paying his
  rent to various third parties. In exchange, plaintiff agreed to receive only a
  small portion of his earned salary (about 25% of the earned salary) until a
  later date, to utilize a portion of the housing as a WBGI business office, and
  to utilize the yard as a corporate nursery/growing-ground over which he
  could provide security. This is a very common corporate and government
  practice. The US military provides either housing or housing-allowance to
  its members. Numerous corporations provide housing to their employees.
  This is but one type of compensation a party might receive for their
  services to the company. Defendants herein proclaimed this payment of
  rent to be a "misappropriation". Defendants herein sought 'repayment' from
  plaintiff of the monies paid to those third parties.

- Legal Expenditures. WBGI did not have an ODL policy in its early years, and instead was self-insured. On one occasion, plaintiff was required to retain an out-of-state attorney to handle a company matter involving his activities as the company president. The attorney that was retained prevailed, and plaintiff herein was vindicated. The attorney advised plaintiff that that was a legitimate corporate expenditure, which it was. Defendants herein proclaimed this payment of legal services to a third party was a "misappropriation" and sought 'repayment' from plaintiff of those monies paid to a third party.

- Corporate Loans. A sum of approximately $50,000 was loaned to a third party entity, which loan was secured personally by the monies owed to plaintiff herein by WBGI for his uncollected salary. This was Board approved and assisted WBGI in obtaining a loan from another party in the sum of approximately $300,000, and which also saved approximately a $100,000 expenditure that WBGI would otherwise have had to make. Loaning and borrowing of money is a well-established corporate practice, and WBGI was very much ahead financially due to that loan to that third party. Defendants herein proclaimed that loan was a "misappropriation", and sought 'repayment' from plaintiff of the money loaned to a third party.

- Numerous other smaller amounts were listed as "misappropriations" but in fact were valid expenditures of WBGI business matters, and defendants herein sought 'repayment' from plaintiff of those monies paid to third parties.

In addition, plaintiff sought and obtained Board permission to sell some of his personal shares of WBGI ownership. Subsequently, this was fraudulently proclaimed by defendant Francik to have been done without approval, and that the monies obtained were a "misappropriation" of WBGI monies, even though WBGI had never had control over that money. Most of those monies were then donated to WBGI in the form of services and goods provided for free to WBGI.

In addition, various expenditures for WBGI goods were characterized as "misappropriations" when defendants herein were unable to understand the nature of a transaction, and refused to consult with plaintiff herein regarding them. These included food and other item purchases for WBGI employees for Holiday Season Gift Baskets, small food and beverage purchases for WBGI employees during sessions of heavy work as a reward and incentive, etc. These were characterized by defendants herein as "misappropriations" and defendants sought 'repayment' from plaintiff for those payments to third parties.

A few personal purchases, made by plaintiff on his credit cards he loaned to WBGI, were subsequently credited as partial payment towards his uncollected salary, as per the contractual agreement thereon. These were mischaracterized by defendants herein as "misappropriations", notwithstanding the payments having been credited to reduce the amount owed to plaintiff, and sought 'repayment' of those monies, while seeking to maintain the reduction in the amount of money owed as well.

Both Nevada and Hawaii statutory law gives officers and directors wide latitude in determining the appropriateness of the appropriations they make. There must be a showing of an overt fraud that benefited the party personally before a claim of "misappropriation" may be considered to be valid. No such frauds were evident, and none occurred, and none of those appropriations benefitted plaintiff personally, and all were designed to benefit WBGI.

In sum, plaintiff herein loaned WBGI approximately $550,000 over the course of a decade, which monies are still owed to plaintiff (and in litigation in Hawaii appellate court as *Wagner v. WBGI*). After plaintiff filed suit to collect thereon following a breach of a repayment agreement, the new 'management' team of WBGI also initiated suit against plaintiff herein as a means of 'offsetting' the monies they owed him, filing bogus claims of "misappropriation" in their two suits (*WBGI v. Wagner*) in Nevada and Hawaii. It is the "misappropriation" claim that is pending in appellate court in Hawaii, after plaintiff herein was whacked in the knee and prevented from attending the "trial" on those bogus claims.