WALTER L. WAGNER
532 N 700 E
Payson, Utah 84651
retlawdad@hotmail.com
808-443-6344

FILED
U.S. DISTRICT COURT

2012 MAR 19  A 11: 37

DISTRICT OF UTAH

BY:_____
      DEPUTY CLERK

# UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | |
|---|---|
| WALTER L. WAGNER, | Case:   2:11cv00784 |
| Plaintiff | **SWORN AFFIDAVIT OF WALTER L. WAGNER IN REBUTTAL TO *REPORT AND RECOMMENDATION* AND IN SUPPORT OF MOTION TO AMEND COMPLAINT** |
| vs. | |
| PRESTON MICHIE, KENNETH FRANCIK, LESLIE COBOS, MARK ROBINSON, ANNETTE EMERSON STEVE BRYANT, WORLD BOTANICAL GARDENS, INC. (WBGI), | **District Judge Clark Waddoups** |
| Defendants | **Magistrate Judge Paul Warner** |

<u>SWORN AFFIDAVIT OF WALTER L. WAGNER IN REBUTTAL TO *REPORT AND RECOMMENDATION* AND IN SUPPORT OF MOTION TO AMEND COMPLAINT</u>

I, Walter L. Wagner, affirm, state and declare under penalty of perjury as follows:

I

<u>INTRODUCTION</u>

In the *Report and Recommendation* prepared by the honorable magistrate judge Paul Warner, he has accepted as true all of the allegations in three state court documents as if the allegations had been litigated at trial, which documents he entitles *Nevada Decision*, *First Hawaii Decision*, and *Second Hawaii Decision*. Not discussed is that the *First Hawaii Decision*, which was on appeal at the time of submission of this matter, has since been returned to the trial court with a decision favorable to myself for a determination as to how much money I am owed by defendant WBGI herein, which appellate decision is attached herewith as *Exhibit "A"*. Further, he has essentially ignored the sworn affidavits of Mr. Calvin Andrus, Mr. Dan Perkins and myself, and not included them in his erroneous factual determinations.

///

In order for this Court to more fully understand the erroneous assumptions of magistrate judge Paul Warner, I will initially detail how those three cases came about, what they covered, and what they did not cover.

II

## *FIRST HAWAII DECISION*

The first case that was filed resulted in the *First Hawaii Decision.* It was filed in 2004 by myself as plaintiff and WBGI as defendant following breach of a repayment program in which WBGI was repaying to me monies I had previously loaned to WBGI. That breach was in May, 2004 and the suit was filed in June 2004 but not actually litigated until late 2005 through to 2008, when it went up on appeal. It was initially dismissed by way of an erroneous decision (*First Hawaii Decision*) in 2008, and has been before the appellate court for four years, followed by a recent reversal of the trial court judge and remand of the case for further proceedings on the *quantum meruit* claim (see attached *Exhibit "A"*). The suit itself involved the monies owed to me, not only for the breach of the then-ongoing repayment program, but for additional extensive monies I had loaned to WBGI on a long-term basis. The breached repayment program constituted about $70,000 (at that time), but the additional breach of monies owed constitutes about $500,000 for extensive services provided by myself over

3

the course of a dozen years. The breach of the repayment program caused those additional monies owed to me (unpaid salary) to become immediately due and payable, even though originally they had not been due for ten years due to a deference agreement that terminated upon the breach. The amount of those monies owed to me far exceeds the *Nevada Decision* amount, as will be noted in the effects of that *Nevada Decision*.

While the reversed trial-court dismissal (*First Hawaii Decision*) did assert that the Promissory Notes referenced by magistrate Warner were "fabricated", that assertion by the trial court judge was not based upon litigated facts. Rather, the only facts presented on that topic were three sworn affidavits. The sworn affidavit of Dan Perkins stated that he had discussed with me the existence of the Promissory Notes over the course of many years, long in advance of that lawsuit, in which I disclosed to him that I was protecting myself legally for all of the money I was loaning to WBGI by recording it as Promissory Notes year by year. The sworn affidavit of Linda Wagner stated that she signed each of those Promissory Notes over the course of many years. And my sworn affidavit stated that I signed each of those Promissory Notes over the course of many years, and that I had discussed those Promissory Notes with Mr. Perkins on many occasions.

///

Contrarily, Judge Hara's *judge pro tempore* (Thomas Yeh, Esq., serving as defendant WBGI's attorney) merely suggested to Judge Hara that they were instead "fabricated".   <u>No actual evidence was presented by anyone that asserted they were "fabricated"</u>.   Nevertheless, Judge Hara 'concluded', based on the mere naked assertion of his friend and *judge pro tempore* (on other cases) that they were "fabricated", ignoring the actual evidence (three sworn affidavits) submitted that they were prepared each year over the course of many years.   The appellate court, on reversing judge Hara, simply directed that the work and services by myself that was performed for WBGI be litigated on a *quantum meruit* basis, rather than by way of the Promissory Note stated valuation.

This claim of "fabrication" is not something that was litigated within the meaning of the term within American jurisprudence, of two sides giving competing facts, followed by an adjudication of the facts by a trier of facts. Rather, one side gave <u>all of the facts that there was no fabrication</u>, and the other side presented no facts (no affidavits, no exhibits, no expert or lay witnesses, nothing), but rather merely an attorney's suggestion of fabrication that was then accepted by his long-time friend, the trial court judge, as being the facts while completely disregarding the actual facts that were presented.

///

Fortunately, not only has judge Hara self-recused himself at a later stage in those proceedings and is no longer qualified to sit in judgment of those matters, he is now also recently reversed by the appellate court.

III

### NEVADA DECISION AND SECOND HAWAII DECISION

The second case was filed by "WBGI" against myself and others in two different jurisdictions (Nevada and Hawaii) in mid-2005, but it set forth identical causes of action. That resulted in two decisions, the Nevada Decision and the Second Hawaii Decision. That second case was filed by one of two competing Boards of Directors for WBGI alleging they were the proper representatives of WBGI and that they were acting on behalf of WBGI. The members of the other board were named as the defendants. It is instructive to this matter to discuss this briefly.

After the appointment of a new Board of Directors by the Founder (myself, as the original sole-individual 'Board of Directors' under Nevada law since 2001) in 2004, this new Board (hereinafter Francik Board, as defendant Kenneth Francik became its chairman) automatically dissolved on December 31, 2004 by the appointment document. It failed to hold elections as required by the appointment document but continued on in existence nevertheless, beyond its

6

tenure. Ten WBGI shareholders who had acquired shares early in the history of the botanical gardens became a competing Board of Directors for WBGI, which was approved as to form and substance by WBGI's long-time Hawaii counsel (Mr. John Price; #002576 State Bar of Hawaii) as to that board's proper appointment by myself following the failure of the Francik Board to hold elections. This competing board was chaired by Ron Tolman, a WBGI shareholder, and is referred to as the Tolman Board, and also included myself as a board member.

In April 2005, the WBGI bank account was frozen when both competing boards sought to control it (before a lawsuit had been filed). The two competing Boards then signed a release to the Bank of Hawaii, signed by both Mr. Tolman on behalf of the Tolman Board, and by defendant herein Francik on behalf of the Francik board, based upon a document prepared by defendant herein Michie. That document is attached herewith as _Exhibit "B"_, and was signed on April 20, 2005. By that document, the bank account was unfrozen and the funds made available to the Francik board on the *proviso* that they would be used solely for routine WBGI matters, and <u>could not be used for litigation of the ongoing dispute between those two sets of WBGI shareholders</u>. A few days later, circa May 2005, the Francik board voted to initiate suit against the individual WBGI shareholders who served as members of the Tolman board

(based on minutes of that meeting I have seen), and on June 30, 2005 suit was filed in Hawaii, and a few weeks later in Nevada, setting forth two identical claims in two states in which WBGI was named as plaintiff, and the ten members of the Tolman Board were named as defendants.  The two suits were virtually identical in their claims.  The two "WBGI" suits were funded *ab initio* by the shareholder monies in contravention of the agreement between Mr. Tolman and defendant Francik, based upon WBGI financial records I have seen showing such.  Defendant Michie explained in writing that he believed he was privileged to spend the shareholder money in contravention of his agreement he had drafted for defendant Francik and Mr. Tolman to sign, because he explained he believed he was allowed to deceive Mr. Tolman, a WBGI shareholder, that they would not file suit against him using shareholder money. Thus, Mr. Tolman was deceived into releasing the freeze on the WBGI account to the control of defendants Francik and Michie and the Francik board, believing that it would be used solely for actual routine WBGI matters and believing that the 'dispute' would be resolved by mediation and negotiation, with a likely actual vote of the shareholders to determine their leadership thereafter as was being sought by Mr. Tolman.  Both the subsequently filed Nevada claim, and the identical Hawaii claim, set forth purely fabricated allegations of supposed wrongdoing on the part of myself during the ten years (1995 – 2004) I spent

building the Hawaii botanical garden, during which time the Francik Board members were off doing other things and not even actual WBGI shareholders (until they obtained ownership interest much later).   Additionally, the two identical claims also had a request seeking a determination from the two courts that the Francik Board had been properly constituted and should be the Board of Directors that should be allowed to continue to direct the affairs of WBGI.

IV

## SEPARATION OF CLAIMS

Because "WBGI" was proceeding in two separate forums on identical claims, as a defendant in the Hawaii claim I filed a motion in the Hawaii court on November 28, 2005 for dismissal of either the Hawaii claim, or alternatively for requiring dismissal of the Nevada claim, so that there would not be a duplication of litigation and so that WBGI would be allowed to proceed in only one of two forums (Hawaii or Nevada).

Rather than granting the motion to dismiss the Hawaii action, nor granting the motion requiring "WBGI" to dismiss the Nevada action, the trial court judge (Judge Nakamura) instead bifurcated the claims, ordering "WBGI" to proceed solely with the monetary claims in Hawaii, and to proceed solely with the "governance" claim in Nevada.   That order was entered shortly after oral

argument was presented, in which I appeared and Tom Yeh appeared on behalf of defendant Francik and defendant WBGI.   At that oral hearing, Tom Yeh quickly decided he wished to retain the monetary claims for his law firm to litigated in Hawaii.  Ron Tolman, I, and the other members of the Tolman Board were initially represented in Hawaii by Mr. John Price, WBGI's long-time attorney, for several months on the Hawaii claim, but because we were unable to privately fund him (as we honored the commitment to not use WBGI funds), we released him from that commitment and proceeded *pro se*.  The Francik Board was represented in Hawaii by Thomas Yeh, Esq., funded by the shareholder monies, and Mr. Yeh also served as both[1] of the Hawaii trial court judges' *judge pro tempore* on other matters.  His services on behalf of the Francik Board were funded by the unfrozen shareholder bank account controlled by the Francik board, in contravention of the agreement between those two boards.

Accordingly, the Nevada case proceeded forward to trial on solely the governance claim.   The issue on the governance claim related to the appointment process of the Tolman board.  Francik's board argued, through their Nevada counsel they funded with shareholder monies, that they had been

---

[1] Hilo is a small town, and there were only two judges on the bench at that level in Hilo, Judge Nakamura and Judge Hara, and Tom Yeh served as their *judge pro tempore* on other matters.

elected in a disputed election, not appointed, and that they still retained tenure. In opposition, Tolman's board argued that the election was invalid, and that the appointment process reviewed and approved by WBGI's counsel was the valid procedure for Board determination. In point of fact, since I controlled 16.67% of the shares at that time, the Francik Board simply refused to recognize my votes at that disputed election, and instead had about 10% of the shares vote for them. The rest of the shares did not vote, because they were on the mainland, not in attendance at the election, and not providing proxies. The Francik Board thus declared themselves the winner.

V

## NEVADA DECISION

The Nevada case reached trial first. At trial in 2006 the Francik board argued that they were the proper board, and that they had been properly elected (and by that time, there had been another election thereafter in 2005 conducted by them, again precluding my shares from voting). The Tolman board through Nevada counsel they privately funded, argued that they were the

proper board, and that the 'election' of the Francik board had been improper[2], and that they were being unlawfully excluded from control of the company. At no time were the monetary damage claims litigated at trial as against myself, and at no time were claims regarding my 'record-keeping' litigated, though allegations regarding them were presented in part to justify the Francik board's desire to circumvent the agreement regarding unfreezing the bank account. To that end, they brought up certain aspects of the record-keeping that WBGI had made prior to their 'tenure', but did not argue those points in support of their claim that their board was validly elected, and those record-keeping allegations were not litigated, as they were irrelevant as to the issue of whether the Francik board election in 2004 was valid or invalid, and as to whether the Tolman board was the proper WBGI board.

While magistrate Warner quotes *dicta* from the *Nevada Decision* pertaining to record keeping, this *dicta* was not based on litigated facts, as those facts were not at issue. Rather, this was dicta that was slipped into the *Nevada Decision* document by the Francik Board's counsel after the trial, as they prepared the document for the judge's signature.

---

[2] The Francik board refused to count my $1/6^{th}$ ownership interest in voting (16.67%), and coerced the shareholders who voted (about 10%) to vote for them, and declared themselves the winner, voting the non-participating shares for themselves as well in contravention to the By-Laws)

The actual facts are more revealing, and do not reveal any actual wrongdoing on my part as detailed somewhat *infra*.

Further, magistrate Warner quotes the Nevada Decision pertaining to my alleged "*removal from the WBGI Board of Directors*"[3] as being proper. This actually goes to show the <u>gross confusion</u> of that Nevada judge pertaining to the issue before him. Specifically, I was never on the Francik Board that they purported was properly elected in that disputed election, and accordingly I was never 'removed' from that Francik Board. The Nevada judge's assertion that my removal from the Francik Board was "proper" was utter nonsense, and shows he never grasped even the most rudimentary facts of the case, namely the existence of two competing boards and that the sole issue of jurisdiction before him was to determine which was the proper governing board.

Not only was that Nevada court judge utterly confused as to the issue before him, notwithstanding voluminous documentation as to the issue, he was confused on his ability to ascertain other facts, and instead simply allowed the Francik Board to draft the *Nevada Decision* for him, which he then signed without it comporting in the least to the facts that were litigated.

---

[3] Page 10, 5th and 6th lines from the bottom of the *Report and Recommendation*

The alleged "*fraudulent scheme to sell shares of WBGI stock to unsuspecting purchasers*"[4] is another such <u>gross confusion</u> on his part.  This arose because of the lies of defendant Francik at that trial, and the judge's inability to discern those lies.  I was afforded the opportunity by the WBGI board to sell-off some of my stock ownership.  This I did, selling approximately 1/5th of my ownership interest (most of which proceeds I then donated to WBGI) while retaining the other 4/5th of my original 16.67% interest.  However, the Francik Board attorney somehow convinced that judge that I actually sold the WBGI treasury shares, not my own shares, even though my share count had been properly reduced in the company database, and no treasury shares had been sold, and there would have been no reason whatsoever to steal and then sell the treasury shares when I already owned a large number of shares.

This sale of my personal shares was an aside in the trial, as it was not relevant to the issue as to which of the two competing boards was properly elected, though the trial court allowed some testimony regarding the sale of my personal shares, which was somewhat disputed by Francik falsely claiming I'd sold the treasury shares.  However, because it was not an issue, either for monetary claims (which were not before that court), or for the sole "governance"

---

[4] Page 10, 7th and 8th lines from the bottom of the Report and Recommendation.

issue that was properly before that court, it was not litigated within the meaning of that term.  In other words, <u>witnesses who could have given testimony in that regard were not called and presented</u>, because their testimony would not have been relevant to the governance issue.  Rather, <u>witnesses with information on those factual issues remained in Hawaii</u>, as discussed below.

Persons who could have given evidence regarding the fact that the shares I sold were my personal shares, not treasury shares, were David Adams, the WBGI office manager at that time, and Linda Wagner, who had served as the bookkeeper for the sale of my personal shares.  Neither of those potential witnesses was present at the trial, because they were not necessary witnesses pertaining to the sole issue of which of the two competing boards was properly elected (the "governance" issue, as it was referred to by the Hawaii court).

In point of fact, the facts related to my record-keeping (which was not litigated and not relevant to the issue of which of two competing boards was properly elected or appointed) are almost exactly <u>opposite</u> to the "*findings of fact*" by the Nevada judge on <u>facts that were not litigated and not relevant</u> to the governance issue.

I kept perfect financial records and other records.  In other words, every check written by me was kept in the WBGI records, all monies received were

deposited in the WBGI accounts and records thereof kept, and every receipt for purchases was kept by me in the WBGI records. What I did not keep, because WBGI never provided funding for it, was a Certified Public Accountant summarization of those records. No such documents existed because they were not generated. Instead, I maintained other ongoing summarizations that the Francik Board did not consider to be "proper financial records" as having been audited by a public accountant, because the shareholders never provided monies to hire one.

Likewise, I kept perfect shareholder records of every shareholder of record, and maintained that in an electronic data-base. Because defendant Francik is (or was at that time) essentially computer illiterate, he was unable to access those records nor find someone else who could do so after the office manager, David Adams, resigned his position with WBGI due to the extensive lying he saw taking place by Francik (as per his numerous sworn affidavits), and defendant Francik failed to request my assistance in that regard (choosing to file suit instead). Because my record-keeping, or alleged lack thereof, was not an issue pertaining to which of two competing Boards of Directors was the proper governing board, my record-keeping was not litigated and I did not present witnesses pertaining to that issue either. Again, neither David Adams (the general officer manager), nor Linda Wagner, the corporate Secretary, were

called as witnesses because they were not required witnesses for the sole governance issue and were not present at that Nevada trial, and were in Hawaii instead.

With respect to the IRS lien allegation, the Internal Revenue Service did indeed place a lien on WBGI property, though that was at my request. There had been other liens on WBGI property (by the original owners, as the property was being paid for over time), and over time these other liens were also reduced in amount.

On September 11, 2001 (9/11) WBGI suffered a severe economic depression not of its own making that bankrupted many Hawaii businesses. All airlines quit flying to Hawaii, causing a severe disruption in tourism, which is the mainstay of WBGI (99.9% of its revenue came from tourism). When they did resume flying, it was at a greatly reduced capacity. It took about six months thereafter for general tourism to return to normal levels. However, during that period of time, one of the Hawaii businesses that bankrupted was a cruise ship that was generating approximately 20% of the WBGI gross income, with very little actual costs associated with that revenue income stream. That lost income was not replaced thereafter by other cruise ships, as no other cruise ships operated in the area at that time. In addition, in 2003 the cruise ship bankruptcy trustee sought $10,000 from WBGI for the last two months of payments that had

been made to WBGI by the cruise ship, in accordance with standard operating procedure for bankruptcies.

All of those factors contributed to WBGI operating seriously in the red from 2001 to 2003 notwithstanding other cost-saving measures that I implemented. I made the executive decision to not lay off WBGI employees (as in the better interest of both WBGI, as well as the State of Hawaii), and also to personally loan additional monies to WBGI (which is the subject of the *First Hawaii Decision* now sent back to the trial court level, though not to the same judge who has since recused himself in these matters, as have two other Hawaii judges also recused themselves). I also worked out an arrangement with Cliff Kamanaka ("Cliff"), who was the Hilo IRS agent. Cliff was aware of my status as a formerly tenured federal agent, and he was pleasant to work with, and we creatively figured out that WBGI could simply owe as back-taxes the IRS withholdings customarily withheld from employee payroll, though with the requirement that a repayment agreement be put in place, and a lien placed on WBGI property. This we accomplished. Cliff cautioned me that I could become personally liable for those taxes should WBGI bankrupt or otherwise not make the payments with the payment program we set up, but I was willing to take that risk, as I believed my efforts to overcome that crisis that bankrupted so many other Hawaii companies would succeed; and indeed they did. By the end of

2004, the IRS payroll back-taxes were paid off and the lien lifted, utilizing the increasing revenues from an economy that had again become robust, and the increasing strength of WBGI as a tourist destination.

Cliff and I had a sufficiently close working relationship that at one time, when we both independently took the same flight from Honolulu to Hilo, he asked me to sit with him, and I did, whereupon we discussed many events, including the WBGI situation from which near-bankruptcy we were then emerging.

However, at trial those facts were not presented as they were not a governance issue.   Cliff was never called as a witness, and was not subpoenaed to appear in Nevada.  I instead simply briefly explained that yes, WBGI had incurred an IRS lien at my direction in order to keep it afloat.  The *dicta* included by the Nevada judge, while technically correct ("[WBGI board members] also discovered the Internal Revenue Service had placed a lien on WBGI's real property to secure payment of overdue payroll taxes.")[5], simply ignores the facts surrounding that issue.  Again, had that been an issue as to which of the two Boards of Directors (Tolman Board or Francik Board) was the proper governing board, I would have subpoenaed Cliff to appear and testify.

---

[5] Extract found on page 10 of the *Report and Recommendations*

Because it was not an issue, the facts surrounding my relationship and arrangements with the IRS were not litigated.   However, Magistrate Warner quotes that excerpt as if there were something wrong in that regard, or as an example of poor record-keeping.  In fact, it was an example of excellent record-keeping and the trust that the IRS agent Cliff placed in me to do the right thing. To protect himself legally, of course, he was obligated to place that lien on WBGI property, which I encouraged and approved of.

Likewise, Cliff was aware by his many conversations with me and with Linda Wagner that WBGI did not owe income tax, as it had been operating in the red since its inception, and was just beginning to emerge from that deficit when 9/11 hit.  As long as my personal income taxes were being filed (which they were, as he was aware of), he was satisfied that WBGI would begin filing corporate income tax returns in the near future, or when it began operating in the black.  Again, he cautioned me that the three years of loss-carryover was 'at risk' of not being utilizable when WBGI began operating in the black, should those tax returns not be filed.  An agreement was thereafter reached with Cliff as to a timeline for having those filed, which agreement was kept.  Again, this was not an example of poor record keeping, but rather of the lack of funds to hire someone to prepare and file returns when it was not absolutely required,

utilizing those funds instead to pay employees instead of laying them off, and to keep WBGI from going bankrupt because of 9/11.

The fact that those tax records were well maintained was subsequently evidenced by WBGI filing of the appropriate past tax returns. Incidentally, even though I preserved WBGI's loss carryover rights to future years, the current Francik Board has placed WBGI even deeper in the red than ever, and was unable to utilize those loss-carryovers I perfected, as they were only good for three years into the then-future (2004 IRS tax year filing, with the loss carryover preserved until 2007), and WBGI continued to operate more seriously in the red than ever, after the Francik Board was 'ratified' by the Nevada judge, with that new 'management team' spending approximately $700,000 of shareholder money on their fraudulent lawsuits.

Because apparently the Nevada judge never even understood that the only issue for him to decide was which of two competing boards was properly constituted, he allowed extensive *dicta* in the *Nevada Decision* on issues that were never litigated, and of matters over which he had no jurisdiction (monetary claims) due to the prior agreement between the parties to litigate only the governance issue in Nevada and restricting his jurisdiction to solely that issue.

///

In summary, the issue of the quality of my record-keeping was never an issue to be litigated before the Nevada judge, and was in fact not litigated. Witnesses were not presented who could have given testimony on those issues, because that would have been an undue expense to fly those three witnesses (Linda Wagner, David Adams, Cliff Kamanaka) from Hawaii to Nevada to testify about matters that were never at issue.

In addition to making extensive *dicta* about facts that were not litigated (based on *dicta* presented for his signature, guised as "findings of fact", by the Francik Board attorney), he also issued monetary damages against myself based upon my alleged sale of treasury shares notwithstanding the limiting of his jurisdiction to the determination of which of two competing boards was properly elected to govern WBGI, the ten-member Tolman Board, or the six-member Francik Board, with no jurisdiction to make findings on monetary claims.

Again, he was bamboozled by the Francik Board attorney into believing that I would somehow have sold the WBGI treasury shares, rather than my own shares of which I had ample number, and of which some testimony was given thereon.  Based upon that, in his *Nevada Decision* he both reduced my share count as if I had sold my own shares, and issued a monetary judgment against me as if I had sold the WBGI treasury shares.

Utilizing that unlawfully obtained monetary judgment in the *Nevada Decision*, the Francik Board then conducted an "auction" of my shares in which only one person bid at a time, namely the Francik Board itself, and sold my shares to themselves for 1/50th of the then going price ($10, the 'opening bid' rather than the $520 they had been selling for, though they are now likely worth less than $10). By this fraud the Francik Board justified claiming I was not a shareholder of the corporation I formed and built. There were actually two persons 'bidding', and they alternated bidding on each block of shares. One person was a member of the Francik Board, and the other person was a representative of the entire Francik Board. Thus, one of the board members enriched himself with thousands of shares for which he paid about 1/50th of the price the other shareholders paid. The rest of the shares were returned to the treasury, and a few weeks later sold to unsuspecting existing shareholders at about ½ of the price that shareholders paid in 2005.

In addition, they fraudulently told the Nevada judge that WBGI did not owe me any money on the *First Hawaii Decision* case. In fact, that case is now recently back to the Hawaii trial court level for the extensive sums WBGI in fact does owe me. Had that served as an offset against the *Nevada Decision*, WBGI would have still owed me approximately $150,000 even if they were awardable a judgment for my sale of my personal shares. Accordingly, their

subsequent sale of the rest (4/5th, with 1/5th sold off by myself) of my personal shares in WBGI to themselves was a complete fraud, and all of their voting thereafter has also been fraudulent as they have not allowed voting by myself.

VI

<u>SECOND HAWAII DECISION</u>

The identical case to the Nevada case that was filed in Hawaii (resulting in the *Second Hawaii Decision*) went to "trial" in Hawaii in 2008. The "governance" issue had been decided in Nevada by a befuddled judge, who never understood that he was deciding between which of two competing boards had properly obtained control of WBGI, and instead simply decided that he believed that the Francik Board had instead simply removed me from its board of directors, and that I was contesting that alleged board removal. ["*the removal of Defendant Walter Wagner from the WBGI Board of Directors was proper.*"][6] Notwithstanding that gross misunderstanding of issue, he seemingly affirmed the Francik Board as the governing board of directors for WBGI, not the Tolman Board.

///

---

[6] Page 10, 6th line from bottom of the *Report and Recommendations*

It was two more years before the Hawaii claim went to "trial", minus the 'governance' issue, on the alleged monetary claims.

I reference the term "trial" in quotation marks for a particular reason. The "trial" was not a trial in any valid system of American jurisprudence. Rather, it was an orchestrated sham in which the two primary defendants (myself and Linda Wagner) were excluded from the courtroom at the "trial" by court order.

Indeed, it is the exclusion from the courtroom and the wrongful issuance of a monetary judgment against me that serves as one of the major damage claims in the instant complaint. That is because the wrongful exclusion was occasioned in conjunction with the defamation of me by defendant Francik, acting both individually and in his capacity as a WBGI agent.

Magistrate Warner completely ignores the facts I set forth in the prior affidavits filed herein, including the two sworn affidavits of Mr. Perkins and Mr. Andrus, both WBGI shareholders, as well as my affidavits. If one ignores the facts, one can reach and 'justify' any conclusion one wishes, but ignoring the facts simply works an injustice, which I believe this Court does not wish to see happen.

This Court is obligated to "*determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may*

accept, reject, or modify the recommended disposition; <u>receive further evidence;</u> or <u>return the matter to the magistrate judge with instructions.</u>"[7]    (Underlining added for emphasis)

Accordingly, rather than repeat the facts *in toto* as described previously by myself and others surrounding the alleged "trial" in Hawaii and why it was not an actual trial within the meaning of American jurisprudence, I will summarize it briefly below, and I direct this Court instead to read all of the sworn affidavits previously filed herein.

My wife Linda Wagner and I both planned to appear at the "trial" to contest the extensive frauds being presented to that court by its *judge pro tempore*, Thomas Yeh Esq., serving as the Francik Board attorney.   Accordingly, approximately 10 days prior to the "trial" Linda Wagner and I both personally appeared at a pre-trial hearing on the case (one of many hearings in the matter over several years, and the last one prior to the "trial"), as did Mr. Yeh.  At that time, judge Nakamura was holding two arrest warrants for ourselves based on fraudulent claims by defendant Francik to a grand jury (Francik's initial acts of defamation asserting we were not corporate officers when we signed Promissory Notes, which he initially asserted to a grand jury, which he

---

[7] Federal Rules of Civil Procedure, Rule 72(b)(3)

thereafter repeated that defamation extensively elsewhere).   However, Judge

Nakamura never mentioned that he was holding those warrants, or that we were

going to be subject to arrest, and of course Judge Nakamura did not arrest us at

that pre-trial hearing.   Neither of us was aware that he had issued such

warrants.[8]   Rather, Judge Nakamura conducted the pre-trial hearing as if no

such warrants existed, and at the end of the hearing he directed us to appear at

the then forth-coming "trial".

Ten days later, we both appeared at the "trial".   The first day of the "trial",

the first half of the day was taken up by other matters before the court.   In the

late afternoon of the first day, the "trial" commenced with defendant herein

Francik on the witness stand.   At the end of the day, he was still on the witness

stand, awaiting my cross-examination, which was to be concluded the following

day.   The following day, both Linda Wagner and I appeared.   She had not been

---

[8] I learned of the existence of those warrants by happenstance the following day.  Linda and I
discussed that fact, and we both concluded that since Judge Nakamura had not arrested us at that
pre-trial hearing even though holding those warrants, he would not arrest us at the "trial", and we
made no prior arrangements for purchasing her an expensive bail bond for which we had no money.
Instead, we filed a motion in that criminal case for a recall of the warrants on the basis that they were
obtained by defendant Francik's lies, and no crime was committed, which we expected would be
routinely granted, and Judge Nakamura was aware of that motion prior to the "trial".  This was
subsequently borne out by the dismissal of those fraudulent criminal charges.  This was well-detailed
in our motion, showing that Francik lied when he falsely claimed Linda had no corporate authority to
sign documents for the corporation she'd helped form, and that another person (defendant Emerson)
had that authority.  All Nevada documents showed he lied, as well as other extensive evidence.

present the previous day as she was required to attend to other matters involving our children.  With Francik still on the witness stand, within ½ hour of Linda Wagner's early-morning appearance, she was arrested by judge Nakamura and removed from the courtroom (with the aid of the Sheriff's office), utilizing the same warrant that he had had at his bench ten days earlier at that pre-trial hearing, but had not executed on at that time.

Accordingly, Linda Wagner was deprived of her trial rights.  She was not allowed to post bail (which took about 5 hours), and then appear at the "trial". She was not allowed a continuance of the "trial".  She was not arrested but then allowed to conduct the trial, then escorted to the jailhouse afterwards.  Rather, her trial rights were completely abridged through no fault of her own.  She was in fact not guilty of any criminal charge, and she was subsequently exonerated of those fraudulent criminal charges initiated by defendant Francik (as was I likewise exonerated).  Likewise, my trial rights were completely abridged, as Linda Wagner was one of my critical key witnesses, in addition to myself, and I was additionally required to leave the courtroom to post her bail.

It is those fraudulent criminal charges initiated by defendant Francik (his acts of defamation both before a grand jury and continuously thereafter) against us that is part of the instant complaint for defamation and the damages that flow therefrom.  Those damages include the deprivation of an actual trial, and

instead the substitution of the sham "trial" that was actually conducted absent both Linda Wagner and myself.

Following the illegal arrest of Linda Wagner, I did what any decent human would do for his spouse – I went and posted bail so she would be released from unlawful incarceration. However, that took five hours, and upon my immediate return to the courtroom later that day, following the posting of bail, the "trial" had concluded in our absence only minutes before my return. No actual litigation of facts took place – rather what took place was an orchestrated presentation of falsehoods guised as facts by numerous witnesses that the defendants herein then called in our absence, without any presentation of the truth or cross-examination of the persons presenting those falsehoods.

Nor could I have remained behind and requested an oral continuance, as has since been suggested by various Francik Board attorneys, funded by the shareholder monies they've stolen from the shareholders and used for lawsuits instead of developing the shareholder assets and protecting the shareholder interests. Judge Nakamura took a "short break" just seconds before Linda Wagner was unlawfully arrested, exited the courtroom through his chamber doors behind the bench, and was not around to where an oral argument could be lodged either by myself or by Linda Wagner. It was clear to me that he would not be returning to his bench while I was still present in his courtroom,

and insuring that other illicit activities did not take place at the jailhouse became of paramount concern to myself.

Accordingly, both Linda Wagner and I were deprived of our right to examine our own witnesses, and cross-examine other witnesses, or otherwise engage in actual litigation of facts to where an appellate record for exam would be available.  The procedure that took place, of having only the Francik Board *judge pro tempore* attorney (Thomas Yeh, Esq.) present only the 'facts' he chose, and none of the actual facts we had intended to present, cannot be considered to be an actual litigation of the facts within any reasonable meaning of American jurisprudence.

Thus, all of the "*findings of fact*" of the *Second Hawaii Decision* are bogus, and not the actual facts, and were not determined by any actual litigation of the facts.

Since all of magistrate Warner's *Report and Recommendation* is based extensively on the alleged "*findings of fact*" contained in the *Second Hawaii Decision*, and not on any of the sworn affidavits already on file herein, it is instructive to again show how they are bogus.

For example, magistrate Warner states "*The Second Hawaii Court found that Wagner mischaracterized funds as loans, business expenses, and **salary**.*

*While the Visitor Center is not specifically mentioned, it is encompassed within the Second Hawaii Court's global finding of misappropriation of corporate funds. Wagner's defamation claim is based on the view that he did not misappropriate funds and that any such statement is false. However, the Second Hawaii Court found to the contrary, that is, that Wagner did in fact misappropriate WBGI funds.*"[9]  While certainly if there had been an actual trial, and litigation of that claim, then a valid decision thereon could be binding to satisfy issue preclusion.

But there was no actual trial, and no actual litigation.  Rather, there was a sham "trial" occasioned by the very acts of defamation complained of herein – namely Francik's lies to his attorney, the grand jury, his fellow board members, the newspapers and others in order to falsely convince them that Linda Wagner and I were not proper WBGI officers when we signed that Promissory Note, when in fact we were proper officers (and had been since the filing of the Articles of Incorporation through to September 2004) and all documents filed with the Nevada Department of Corporations and the Hawaii Department of Commerce show as such.  But by acting in secret behind the closed doors of a grand jury, defendant Francik was able to prevent an actual trial and litigation of facts, and instead had his attorney provide extensive "findings of fact" that were

---

[9] Top of page 13 of the *Report and Recommendation*

contrary to the actual facts but in support of his sham position, following the sham "trial".

It was well known to defendant Francik that both Linda Wagner and I were WBGI officers continuously from the date of Nevada incorporation (April 12, 2001) through until mid-2004, and in particular, on January 1, 2004 when we signed the last in a series of promissory notes. Defendant Francik had been hand-delivered a letter from WBGI's attorney Sherrill Erickson on May 25, 2004, and I was present when he was hand-delivered the letter and he read it, because she also hand-delivered my copy of the letter to me, while we were both at her office. A redacted copy of that letter is attached herewith in *Exhibit "C"*. Also attached to her letter were the items referenced in her letter, as well as the "*Certificate of Acceptance of Appointment by Resident Agent*" signed by defendant Emerson (included in *Exhibit "C"*). Not included with her letter, of course, was the subsequently filed "*Amended Annual List of Officers, Directors and Resident Agent of World Botanical Gardens, Inc.*" (included in *Exhibit "C"*) that defendant Emerson submitted for filing on September 2, 2004. That document was the first instance in which Linda Wagner was removed as a WBGI corporate officer, since both the Secretary and Treasurer position went to defendant Emerson (and my position as President went to defendant Francik).

Not only was defendant Francik aware of the fact that Linda Wagner was a WBGI corporate officer on January 1, 2004, because of the hand-delivered letter he received from WBGI's attorney, as well as my conversations with him; he was also aware that between June and August 2004 he had several communications with WBGI's attorney on how to replace the WBGI corporate officers, which correspondence I have seen; and on September 2 he conducted a vote of his board (minus myself) to replace Linda Wagner and myself as corporate officers which vote was reflected in the minutes of that meeting, which minutes I have seen, as well as in the document submitted to Nevada by defendant Emerson.

Nevertheless, having all of that knowledge of Linda Wagner as a WBGI corporate officer, he appeared before the Hilo grand jury in February 2008, swore under oath to tell the truth, the whole truth, and nothing but the truth, and then proceeded to declare that defendant Emerson had replaced Linda Wagner as a WBGI corporate officer in August 2003, which false and defamatory statement he has been repeating ever since to numerous parties. I am well aware that he perjured himself in that regard because I have also seen the transcripts of that grand jury proceeding. Nowhere did he mention to that grand jury that he had received a letter from WBGI's attorney advising that Linda Wagner was a corporate officer continuously until the writing of Ms. Erickson's

letter in May, 2004; nowhere did he mention to that grand jury his communications with Ms. Erickson in June, July and August, 2004 regarding how to replace Linda Wagner and myself as officers; and nowhere did he mention to that grand jury the vote his board conducted on September 2, 2004 to replace Linda Wagner and myself as officers with himself and defendant Emerson.  Rather, he simply lied to the grand jury and falsely proclaimed that Linda Wagner had committed the felony of signing a corporate document when no longer a corporate officer.  Apparently, he believed his own lies regarding my record-keeping, believing I would not have the documents proving his lies to the grand jury.

With respect to the alleged "misappropriations", all of the appropriations made by myself as a WBGI officer were reviewed by numerous other shareholders, and were approved by the Board of Directors and subsequently ratified year-by-year by the shareholders.  At no time during that ten-year period (1995-2004) did anyone make any claims of misappropriation.  Not until defendant Francik learned that Ron Tolman was challenging his authority to govern WBGI did he begin making those false accusations.  Rather than make "misappropriations" of **salary**, I loaned WBGI approximately $450,000 by not collecting most of my earned salary, and only drew approximately $120,000 in salary over the course of nearly 10 years.  This was not presented at the "trial"

because I was precluded from attending by the criminal collusion of defendant Francik with the trial court judge.  Likewise, the **business loans** were approved by the Board, reviewed by other shareholders, and collateralized by the money owed to me, and were not misappropriations.  That evidence was not presented at the "trial", again because I was precluded from attending, as was Linda Wagner.  Likewise, the **business expenses** were all valid business expenses, approved by the Board and other shareholders, and did not serve to enrich me personally.  Again, not presented at the "trial" because I was precluded from attending.

Magistrate Warner also asserts that I "*diverted WBGI funds [for] personal purposes.   These included funds for [a] personal mortgage, property tax payments[,] personal credit card payments[,] and for debts incurred to creditors for personal expenditures.*"[10]   Again, that is what defendants Francik et al. wished the trial court to believe, and which testimony they gave asserting as such at the sham "trial".  The truth was that all of those expenditures had valid WBGI purposes, and were misconstrued by defendant Francik et al.   For example, WBGI had agreed to make housing payments to myself (as it had done since 1995) because I was providing an office space, a yard that served

---

[10] Last paragraph commencing on page 12 of the *Report and Recommendations*

as a service-yard and nursery, and because I was not actually drawing my salary.  This is no different than any other company providing benefits, including often housing benefits, to its employees in addition to salary.  Thus, Francik construed the payment by WBGI of the house payments as an "illegal diversion", even though board approved and proper, particularly in light of the fact that I was not drawing a salary, and the amount paid was the same amount that was paid both earlier to various other landlords WBGI rented from, and after when the Francik board itself leased office-space elsewhere at the same monthly rate.

Likewise, the "personal credit card payments" were my personal credit cards that I loaned to WBGI (Francik et al. did not loan his credit cards, so that obligation fell to me to keep the company afloat post 9/11) on which a few personal charges were made, and separated out during our routine audit and deducted from the salary owed to me and credited as part of my miniscule WBGI income.

However, the actual facts showing that those expenditures were legal and proper was not presented to the trial court judge because we were prevented from attending the "trial".

///

Likewise, magistrate Warner finds that the *Second Hawaii Decision* "*addressed the issue of whether Wagner's spouse was a director or officer of WBGI, which is also part of Wagner's defamation claim. The Second Hawaii Decision provides that 'Defendant Linda Wagner has admitted in deposition testimony that after Annette Emerson became Treasurer, she no longer had any position of authority and was neither an officer [nor] director of WBGI' Accordingly, the Second Hawaii Court has explicitly ruled on that issue.*"[11]

Again, one can reach any decision one wishes if one ignores the facts.

Annette Emerson gave testimony at that "trial", but without either Linda Wagner or me available to cross-examine her. She perjured herself at that "trial" by telling the judge that she (Emerson) became the WBGI corporate Treasurer in August, 2003 and replaced Linda Wagner as a corporate officer at that time, according to the transcript of that testimony she gave at that "trial" that I have read. In fact, she was not recorded as the Treasurer of WBGI until circa June, 2004, and was not recorded as the Secretary and Treasurer until September 2, 2004, according to the Nevada Department of Corporation documents, which I have seen and some provided herewith as *Exhibit "C"*. The person who was recorded on the Nevada Department of Corporation records as

---

[11] First full paragraph of Page 14, *Report and Recommendations*

being both the Secretary and Treasurer throughout all of 2003 was Linda Wagner (and in that capacity since 2001 when WBGI incorporated anew in Nevada), and in February 2004 that was changed to show Dan Perkins replacing Linda Wagner as the Treasurer, while Linda Wagner remained as the Secretary.

Not only did Emerson perjure herself in that regard (knowing that Linda Wagner was sitting at the jailhouse at that time and could not challenge her), so too did Francik perjure himself. In fact, the only position Ms. Emerson obtained with respect to WBGI in 2003 was her election to a board of directors (of the Joint Venture Partnership that controlled WBGI). At no time was Ms. Emerson ever elected or appointed by that board (of which board I was also a member) to replace Linda Wagner in her capacity as a WBGI corporate officer, positions both of us held until September 2, 2004, some eight months AFTER Linda Wagner signed that Promissory Note. It is pure perjury and hokum to assert that Linda Wagner was not a WBGI officer when she signed that WBGI Promissory Note, notwithstanding what Judge Nakamura did at that "trial" in conjunction with Francik's perjury and defamation leading to the false arrest of Linda Wagner at the "trial".

Again, there was never any actual litigation of those facts within the meaning of American jurisprudence. Had Linda Wagner been allowed to testify,

she would have testified that she provided extensive instruction in early 2004 to Ms. Emerson on how to operate the WBGI computer programs pertaining to its finances, how to do WBGI bookkeeping and other record-keeping, etc. in preparation for grooming her to possibly become a corporate Treasurer, because I observed Linda Wagner engaged in that activity at the WBGI office. Defendant Emerson had taken over limited book-keeping responsibilities in late 2003 as a volunteer to assist Linda Wagner.  Linda Wagner also would have testified that her deposition statement that she (Linda) quit serving as an officer after Emerson became a WBGI officer was true, but that Emerson did not become a WBGI officer until late in 2004, not in 2003.  And my testimony would have shown the same as Linda Wagner's, and also that Emerson herself actually filed two Nevada Department of Corporation documents in early 2004, neither of which replaced Linda Wagner as a corporate officer, with Emerson's knowledge of Linda's capacity as a WBGI officer, before she filed a Nevada document on September 2, 2004 in which Linda Wagner was replaced by Emerson as a corporate officer.  Absent that testimony on our part, defendants Emerson and Francik were given *carte blanche* to perjure themselves on that issue, knowing that we were occupied at the Hilo jailhouse and would not challenge their perjured testimony on the witness stand.

///

But, of course, Linda Wagner was arrested and removed from the "trial" by the criminal frauds of defendant Francik and was not able to give that testimony, and I was forced to remove myself to attend to her bail.

Once again, issue preclusion can only operate on issues that were actually litigated within the meaning of that term, not on issues in which the parties were fraudulently prevented from litigating on them.

## VII

## FRAUD, WASTE AND MISMANAGEMENT

In point of fact, the fraud waste and mismanagement claim is likely going to be litigated by other shareholders in other forums (Utah state court, and the other state courts in which those shareholders reside, or in other Federal court jurisdictions) because they are now becoming aware of these extensive frauds on the part of the defendants herein that have cost the shareholders dearly.

However, as mentioned, I am owed approximately $500,000 for unpaid salary that I deferred during the construction of the botanical garden, to both keep the company from bankrupting, and to advance its development.

After the first case to go to trial, the *Nevada Decision* trial of 2006, the defendants fraudulently sought monetary damages against me, after agreeing

with the *Second Hawaii Decision* court (Judge Nakamura) that the only facts to be litigated in Nevada pertained to the governance issue, and NOT to their monetary claims. They then fraudulently claimed that I was not owed any money for the work I had done in constructing the botanical garden. They simply provided that naked fraudulent assertion, absent even the reversed *First Hawaii Decision* that hadn't yet been rendered (the *First Hawaii Decision*, reversed in 2012, was not entered until 2008). Based on that fraudulent assertion that I was not owed money by WBGI, the Nevada trial court judge approved a fraudulent "auction" of my shares. The "auction" in 2007 was not advertised, and only one party (the WBGI Board representative, and one of its members, who alternated being the 'bidder') 'bid' for each block of shares that was offered. Each block thus went for the 'opening bid' that was set at $10/share (compared to the last selling price by WBGI of $520/share in 2005). The bids alternated between an individual member of the board of directors, and WBGI itself represented by another member of the board of directors, with only one party bidding at a time (i.e. only one bid) for each block of shares up for 'bid'. This fraud was then presented to the trial court for ratification, and by that fraud they thus claimed I was no longer a shareholder.

However, even if that judgment were valid (which it was not because the defendants herein fraudulently sought monetary damages in contravention to

their agreement to seek them only in Hawaii), the money owed to me by WBGI far exceeds that fraudulently obtained Nevada monetary decision. Accordingly, now that the *First Hawaii Decision* is reversed with a finding that I am owed money for developing the botanical garden, it is obvious that the sale of my shares to 'satisfy' their fraudulent monetary claim in Nevada is bogus as well.

It is because of all of these frauds that the defendants have financed with the shareholder funds, paying attorneys in Hawaii, Nevada and now Utah to promote those frauds, that they have taken WBGI on a disastrous course.

They liquidated 90% of its land holdings, selling off nearly 1/3rd (90 acres) to another WBGI shareholder who promptly commenced a competing operation that is very successful, having taken the major asset of WBGI (the Umauma Falls – see www.umaumaexperience.com) and which is now far out-performing financially the remaining 26 acres of WBGI. Since the WBGI shareholders did not approve of these frauds or land divestments, and were kept in the dark about them, they too will likely be filing their own individual suits if this Court elects to disregard my claim for fraud, waste and mismanagement and not appoint a receiver to salvage what can be saved of WBGI.

///

///

VIII

## FRAUDULENT APPLICATION TO WBGI

This Court might be wondering how someone such as defendant Francik became involved with WBGI.  It was by fraud on myself.  When we accepted people into the WBG-JVP, we had a nominal vetting process.  In that regard, before he was allowed to become a JVP member, I inquired as to defendant Francik's status.  I was informed, through the services of Mr. Dan Perkins, that defendant herein Francik was reporting that he was a retired police officer from the city of Los Angeles, and that following his retirement he had gone into the restaurant business and that he was a successful restaurant owner.  Believing that his monies were honest monies, I allowed him to participate in the JVP.

However, in 2004 I learned, through admissions he made to me orally that should be considered as 'declarations against interest' and true, that he was not retired from the LAPD but fired from the LAPD, and that circa 1995 he had been prosecuted by his nominal former boss, the Los Angeles District Attorney, on felony charges for being a liar and giving perjured testimony while serving with the LAPD.  Defendant Francik orally reported to me in 2004 that the prosecution had been unsuccessful and that he was allowed to instead collect a retirement pension.  He of course denied that the charges against him were true.  He also

reported to me that his "restaurant business" was actually two hot-dog stand turn-key franchises ("Cupids Hot-Dogs") in which operations he was losing money, and both of which he sold off at a loss.  Had I known the truth regarding his background, he would not have been allowed to become a member of the botanical gardens.

DATED:  March 15, 2012

Walter L. Wagner

# EXHIBIT "A"

**First Hawaii Decision** Appellate Reversal

Electronically Filed
Intermediate Court of Appeals
28998
25-JAN-2012
12:21 PM

NO. 28998

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI‘I

WALTER L. WAGNER, Plaintiff-Appellant
v.
WORLD BOTANICAL GARDENS, INCORPORATED, Defendant-Appellee.

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 04-1-232)

<u>JUDGMENT ON APPEAL</u>
(By: Ginoza, J., for the court[1])

     Pursuant to the Opinion of the Intermediate Court of
Appeals of the State of Hawai‘i entered on December 23, 2011, the
Judgment entered by the Circuit Court of the Third Circuit
(Circuit Court) on January 15, 2008 is vacated to the extent that
it enters judgment on Plaintiff-Appellant Walter L. Wagner's
(Appellant) claim for quantum meruit in favor of Defendant-
Appellee World Botanical Gardens, Inc. (Appellee) and against
Appellant.  This case is remanded to the Circuit Court for
further proceedings on Appellant's claim for quantum meruit
consistent with the Opinion.  In all other respects, the Judgment
is affirmed.

     DATED: Honolulu, Hawai‘i, January 25, 2012.

FOR THE COURT:

Associate Judge

---

[1]  Foley, Presiding Judge, Reifurth and Ginoza, JJ.

# EXHIBIT "B"

## Tolman/Francik Agreement to not spend Shareholder Funds on Litigation

**(due to the poor quality of the copy, the actual text of paragraph 3 follows)**

"3.   No WBGI funds, whether previously deposited or received and deposited within the corporate account may be used to take legal action against either party over governance of the affairs of WBGI."

The named parties are:

John H. Price (WBGI's original counsel) for the "Tolman Board"

Ron Tolman as Chairman of the "Challenging Board" aka "Tolman Board"

Preston Michie as "legal council"(sic) on behalf of the "Control Board"

Ken Francik as Chairman of the "Control Board" aka "Francik Board"

04 20 2005 21 46 FAX 208••370•0222    PBS inc.    ⓐ 002

**Preston Michie**
Vice Chairman and General Counsel
World Botanical Gardens, Inc
Attorney at Law
321 SE Alder Street # **7**
Portland, Oregon 97214
pmichie@qwest.net
Cell **503**-8]4-7331; Office 503-235-0204

April 20, 2005

Mr. Ronald J. Tolman
5400 N Riffle Way
Boise, Idaho 83703

**Re:** Release of WBGI Bank Accounts at Bank of Hawaii

Dear Mr. **Tolman:**

<u>Agreement and Stipulation:</u>

Whereas a dispute has arisen concerning governance of World Botanical Gardens, Inc. and that legal council has been retained by both parties, Mr. Preston Michie representing WBGI's current Control Board and John Price representing the Challenging Board.

It is further agreed that **Mr. Ken Francik is** acting on behalf of the current Control Board and Mr. Ron Tolman is acting on behalf of the **Challenging Board.**

**It** is therefore agreed and stipulated between the parties (defined as the **current** Control Board and the Challenging Board) that:

1. **All** gate receipts and other revenues of WBGI, including any receipts received **over the** past few days that have not yet been deposited, will be deposited into WBGI's bank account at Bank of Hawaii.

2. The company's normal, routine **expenses that** have been incurred in the ordinary course of business (such as payroll, mortgage payments, taxes) shall continue to be paid from WBGI's accounts as they come due, under the direction of Ms. Annette Emerson who has been managing the accounts of WBGI since last fall. If any extraordinary expenses (such as unusual legal fees or unusual travel) arise Mr. Ken Francik and Mr. Ron Tolman will work together to approve the expenditure. Ms Annette Emerson is authorized to make bank records available to Mr. Ron Tolman upon reasonable request.

3. No WBGI funds, whether previously deposited or received and deposited within **the** corporate account may be used to take any legal action against either party over governance of the affairs of WBGI.

Page 1 **of 1**

Preston Michie
Vice Chairman and General Counsel
**World Botanical Gardens, Inc.**
Attorney at Law
321 SE Alder Street # 7
Portland, Oregon 97214
pmichie@qwest.net
Cell 503-804-**7331**; Office 503-235-0204

4. Both parties agree to indemnify Ms. Annette Emerson out of WBGI funds for any legal action arising out of her writing checks or making expenditures within the scope of her duties as the Treasurer of WBGI.

5. Both parties agree **not** to seek damages from, and to indemnify and hold **The Bank of** Hawaii harmless from any claims related to releasing WBGI's account and allowing WBGI to continue to use the account in the same manner as was the case before the dispute over ownership of the account came to the attention of the Bank of Hawaii.

6. The Bank of Hawaii is an intended third party beneficiary of this agreement, and may rely on the promises contained in **this** agreement intended for the benefit of the Bank of Hawaii.

7. **Mr. Ken Francik** and Mr. Ron Tolman are authorized to represent the parties and execute any necessary documents the **Bank** of Hawaii may require to release the account.

This agreement shall remain in effect until such time that the dispute **over** governance of WBGI is resolved.

The parties, through Mr. Ken Francik and Mr. Ron Tolman, agree to work together in good faith to try to resolve the dispute over governance of WBGI.

Mr. Ken Francik represents that he **is** authorized to represent and bind **the** current members **of** WBGI's Board.

Mr. Ron Tolman represents that he is authorized to represent and bind the members **of the** Challenging Board, including Mr. Walter Wagner

| | |
|---|---|
| Ken Francik                    Date | Ron Tolman                    Date |
| Chairman, World Botanical Gardens, Inc. | Chairman, Challenging Board |

John H. Price                    Date
For Walter L. Wagner

# EXHIBIT "C"

**5-25-2004 Redacted Sherrill Erickson Letter hand-delivered to Ken Francik**

**3-19-2004 WBGI Corporate Filing by Defendant Emerson**

**9-2-2004 WBGI Corporate Filing by Defendant Emerson**

**Sherrill Erickson**
**Attorney at Law**
**82 Ponahawai Street**
**Hilo, Hawaii 96720**

(808) 969-4817 (fax)    (808) 933-1930    (808) 960-0921 (cell)
legalhilo@yahoo.com

May 25, 2004

World Botanical Gardens, Inc.                **CONFIDENTIAL PRIVILEGED**
Walter Wagner
Ken Francik
Via hand delivery

Re: Status of World Botanical Gardens, Inc.

Gentlemen:

I am providing to you herewith a "Certificate of Existence with Status in Good Standing" for World Botanical Gardens, Incorporated[1] by Dean Heller the Secretary of State of Nevada certifying that the records of the Nevada Secretary of State, as of the date of the certificate (April 30, 2004) evidence that World Botanical Gardens is a duly organized corporation under the laws of Nevada and existing under and by virtue of the laws of the State of Nevada since April 12, 2001 and is in good standing in the State of Nevada.

I am also providing to you herewith a copy of the Articles of Incorporation for World Botanical Gardens and a copy of the Annual List of Officers, Directors, and Resident agent for World Botanical Gardens for the filing period of **April 12, 2003 to April 12, 2004.** These Nevada records indicate that the President of World Botanical Gardens is Walter L. Wagner; the Secretary is Linda Wagner; the Treasurer is Dan Perkins; and the sole Director is Walter L. Wagner.

Pursuant to World Botanical Garden's Articles of Incorporation the corporation is authorized to issue 1500 shares of stock without par value. The State of Nevada does not provide public records identifying or listing the shareholders of the corporation, however my understanding from speaking to Walter Wagner is that he personally owns all the shares of World Botanical Gardens "in trust" for the joint venture partnership discussed below. If this is the case, then as a "trustee" he would generally have a fiduciary duty to the joint venture partnership.

---

[1] World Botanical Gardens, Inc. is identified in the Nevada Records as World Botanical Gardens, Incorporated (hereinafter referred to as "World Botanical Gardens").

am providing that form and instructions to you as well.

It has been a pleasure assisting you and I am happy to report that World Botanical Gardens, Incorporated is existing and in Good Standing in the State of Nevada. I hope this letter and the enclosures, forms, and instructions I have provided herewith will assist you in developing your interesting business venture. Should you require additional legal research or assistance, please do not hesitate to contact me.

Thank you again for the opportunity to assist you with this matter.

Very truly yours,

Sherrill A. Erickson

Enclosures

**DEAN HELLER**
**Secretary of State**
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684 5708
Website: secretaryofstate.biz

**FILED #** _____

MAR 1 9 2004

IN THE OFFICE OF
~Dean Heller~
DEAN HELLER SECRETARY OF STATE

**General instructions for this form:**
1. Please print legibly or type; Black ink Only.
2. Complete all fields.
3. The *physical Nevada* address of the resident agent must be set forth;
   PMB's are not acceptable.
4. Ensure that document is signed in signature fields.
5. Include the filing fee of *$60.00.*

ABOVE SPACE IS FOR OFFICE USE ONLY

World Botanical Gardens, Inc.                    C9341-2001
_____              _____
Name of Entity                                   File Number

The change below is effective upon the filing of this document with the Secretary of State.

Reason for change: (check one) ☒ Change of Resident Agent  ☐ Change of Location of Registered Office

The former resident agent and/or location of the registered office was:

Resident Agent: Daniel Perkins

Street No.: 1973 N Nellis Blvd #204

City, State, Zip: Las Vegas, NV  89115

The resident agent and/or location of the registered office is changed to:

Resident Agent: Annette Emerson                    161752

Street No.: 1380 Greg St #204

City, State, Zip: Sparks, NV  89431

Optional Mailing Address: _____

NOTE:      For an entity to file this certificate, the signature of one officer is required.

X Walter L. Wegner / President
_____
Signature/Title

# Certificate of Acceptance of Appointment by Resident Agent:

I hereby accept the appointment as Resident Agent for the above-named business entity.

X Emerson                                          3-15-04
_____              _____
Authorized Signature of R.A.  or  On Behalf of R.A. Company       Date

*This form must be accompanied by appropriate fees. See attached fee schedule.*    Nevada Secretary of State RA Change 2003
                                                                                     Revised on 11/18/03

"*Amended*"

(PROFIT) ANNUAL LIST OF OFFICERS, DIRECTORS AND RESIDENT AGENT OF

World Botanical Gardens, Inc.
(Name of Corporation)

FILE NUMBER: 9341 - 2001

FOR THE FILING PERIOD OF ~~9-1-2001~~ April 2004 TO ~~9-1-2005~~ April 2005

The corporation's duly appointed resident agent in the State of Nevada upon whom process can be served is:

Annette Emerson
1380 Greg St #204
Sparks, NV 89431

☐ CHECK BOX IF YOU REQUIRE A FORM TO UPDATE YOUR RESIDENT AGENT INFORMATION

Important: Read instructions before completing and returning this form.

THE ABOVE SPACE IS FOR OFFICE USE ONLY

1. Print or type names and addresses of their residence or business, for all officers and directors. A President, Secretary, Treasurer, or equivalent of and all Directors and all directors must be named. Have an officer sign the item. FORM WILL BE RETURNED IF UNSIGNED
2. If there are additional directors attach a list of them to this form.
3. Return the completed for with the filing fee. A $75.00 penalty must be added for failure to file the form by the deadline. An annual list received more than 90 days before its due date shall be deemed an amended list for the previous year.
4. Make your check payable to the Secretary of State. Your cancelled check will constitute a certificate to transact business per NRS 78.155. To receive a certified copy, enclose an additional $30.00 and appropriate instructions.
5. Return the completed form to: Secretary of State, 202 North Carson Street, Carson City, NV 89701-4201, (775) 684-5708.
6. Form must be in the possession of the Secretary of State on or before the last day of the month in which it is due. (Postmark date is not accepted as receipt date.) Forms received after due date will be returned for additional fees and penalties.

**CHECK ONLY IF APPLICABLE**

☐ This corporation is a publicly traded corporation. The Central Index Key number is: _____

☐ This publicly traded corporation is not required to have a Central Index Key number.

| NAME | TITLE | | | |
|---|---|---|---|---|
| Kenneth Francik | PRESIDENT (OR EQUIVALENT OF) | | | |
| ADDRESS | CITY | St | Zip | |
| 687-C Lariate Ln | Simi Valley | CA | 93065 | |
| NAME | TITLE | | | |
| Annette Emerson | SECRETARY (OR EQUIVALENT OF) | | | |
| ADDRESS | CITY | St | Zip | |
| 1380 Greg St #204 | Sparks | NV | 89431 | |
| NAME | TITLE | | | |
| Annette Emerson | TREASURER (OR EQUIVALENT OF) | | | |
| ADDRESS | CITY | St | Zip | |
| 1380 Greg St #204 | Sparks | NV | 89431 | |
| NAME | TITLE | | | |
| Lanny Neel | DIRECTOR | | | |
| ADDRESS | CITY | St | Zip | |
| P.O. Box 324 | Honomu | HI | 96728 | |

I declare, to the best of my knowledge under penalty of perjury, that the above mentioned entity has complied with the provisions of NRS 360.780 and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

X Signature of Officer
Annette S Emerson

Title: Secretary / Treasurer   Date: 9-2-04

Nevada Secretary of State Form ANNUAL LIST-PROFIT 2003
Revised on 09/24/03