WALTER L. WAGNER
532 N 700 E
Payson, Utah 84651
retlawdad@hotmail.com
808-443-6344

FILED
U.S. DISTRICT COURT

2012 JUN 21  P 12: 32

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | |
|---|---|
| WALTER L. WAGNER, ) | Case:   2:11cv00784 |
| ) | |
| Plaintiff ) | **SWORN AFFIDAVIT OF** |
| ) | **WALTER L. WAGNER IN** |
| vs. ) | **SUPPORT OF ANDRUS'** |
| ) | **APPOINTMENT AS** |
| ) | **RECEIVER** |
| PRESTON MICHIE, KENNETH ) | |
| FRANCIK, LESLIE COBOS, MARK ) | |
| ROBINSON, ANNETTE EMERSON ) | |
| STEVE BRYANT, WORLD BOTANICAL ) | |
| GARDENS, INC. (WBGI), ) | **Clark Waddoups, Judge** |
| ) | |
| Defendants ) | **Paul Warner, Magistrate** |
| ) | |

## SWORN AFFIDAVIT OF WALTER L. WAGNER

## IN SUPPORT OF ANDRUS' APPOINTMENT AS RECEIVER

I, Walter L. Wagner, affirm, state and declare under penalty of perjury as follows:

I have read the pleadings and affidavits filed herein.  It is readily apparent that the current 'management' of WBGI is focused on litigation and has not been working in the interests of the WBGI shareholders.

Mr. Andrus is willing and able to serve as a Receiver should this honorable Court choose to appoint him in such capacity.  In support of his interest, I note the following:

I

## BACKGROUND

1.    Mr. Andrus was instrumental in forming WBGI in 1994 and 1995, having assisted myself in those organizational efforts at that time.  I met with him extensively over the course of nearly a year to organize the corporation, raise capital, and develop interest in the project in numerous individuals.  Thereafter, he left the management of WBGI to myself, and all

appeared to be going well until circa 2005, when the new 'management team' headed by defendant Francik began its operations of selling off the land that had been acquired in 1994, engaging itself in numerous lawsuits with myself (which suits were frivolous and fraudulent), and losing sight of the direction of forming a world-class botanical garden, all the while depleting WBGI of its financial resources that I had acquired for the WBGI shareholders over the course of a decade.

2.     I have filed numerous sworn affidavits herein, which I repeat and reassert as if set forth in full herein.  It is to be noted that no affidavits have been filed that present any opposing facts.   I summarize the facts previously asserted by myself below as they relate to the need for the appointment of a Receiver:

3.     During 2004 I continued to assist raising capital for WBGI, as I had been doing since 1994.  During 2004 approximately $500,000 in capital from new investors was raised, primarily through the efforts of Mr. Dan Perkins, with some assistance from myself, and deposited into the WBGI general operating account at the Bank of Hawaii, which was at that time controlled by the Francik board, for development of WBGI.  I believed what we were telling the new investors, namely that their investment funds would

be used to continue the development of the project along the lines I had detailed during the previous decade, and with which they had become greatly enamored.

4.      In late 2004 and early 2005 I continued to assist in obtaining a *Special Use Permit* from the County of Hawaii for development of the intended Visitor Center (which required a special permit in order to sell non-farm merchandise), which permit was obtained through the services of WBGI's then attorney, Mrs. Sherrill Erickson.  Approximately $20,000 of an additional approximately $220,000 that was raised separately from existing investors (WBGI shareholders who were induced to invest additional monies beyond their initial investment) was spent on obtaining the *Special Use Permit.* I met extensively with Mrs. Erickson in that regard, providing her with extensive material thereon, and I attended the several public hearings held thereon.   The remaining $200,000 (the Visitor Center Account money not spent on the *Special Use Permit*) was still in the WBGI Visitor Center account in 2005, the last time I was provided account records. The Visitor Center Account had been set up at the Bank of Hawaii by WBGI (I was one of the parties present when the account was opened) with assurances to the existing shareholders by defendant herein Francik

4

that the monies deposited therein from further investment by existing shareholders would be used exclusively for construction of the intended Visitor Center and for no other purpose.

5.     Circa early 2005 I learned that defendant Francik was lying about me to his board members with respect to the approval of the sale of some of my personal share ownership in WBGI.  Because WBGI had, in mid 2004, discontinued payment on the credit card loans I had made to WBGI, I was given permission to sell some of my shares to cover those monthly payments.   However, in early 2005 Mr. Perkins, who was at that time on the Francik board, advised me that defendant Francik was falsely claiming to his board members that I had been selling WBGI treasury shares and pocketing the money (which would be a form of embezzlement), rather than my own shares as he was well aware.

6.     Circa mid 2005 I learned that the Francik board had filed suit against myself, based in large part on defendant Francik's fraudulent assertion that I had sold WBGI treasury shares and pocketed the money.  That suit was actually filed as two separate suits, one in Nevada and one in Hawaii, both fraudulently asserting that I had sold WBGI treasury shares and pocketed the money, and both asserting that the Tolman Board that had been

5

lawfully appointed and had sought to remove defendants Francik, Michie et al. from control of WBGI's finances, was not the proper WBGI board, but rather that the Francik board was properly emplaced. Additional allegations of those two nearly-identical suits were likewise false, fraudulent, or both.

7.    The attorney who was chosen by defendants herein to file the defendants' suit in Hawaii was a long-time college friend of defendant Michie from the days when they used to play basketball together. That attorney, Mr. Yeh, also happened to be the *judge pro tempore* for the two Hilo judges who had jurisdiction over the two Hawaii cases that were filed. Over the course of the next several years, the WBGI accounting records (which I have seen) show that Mr. Yeh was paid approximately $500,000 from WBGI accounts, with another approximately $200,000 going to their Nevada attorney, in support of those frauds. Rather than being used to construct the much-needed Visitor Center and develop WBGI as the shareholders had been promised, their investment capital instead went into the pocket of defendant Michie's college crony as he promoted the frauds of defendant Francik. After obtaining the *Special Use Permit* for construction of the Visitor Center, and after WBGI paid approximately

$20,000 to the architect (Mr. Neil Erickson) for Visitor Center working architectural plans and a scale model, and after raising $220,000 of dedicated Visitor Center Account funds from existing WBGI shareholders, the Francik Board completely abandoned that $500,000 project, and pocketed the remaining $200,000 of the Visitor Center Account money with Mr. Yeh instead.

8.      The Visitor Center project had been in the works since the inception of WBGI, and in active planning since Mr. Erickson was retained to prepare architectural drawings for the Visitor Center back in 2000. Those plans were completed by Mr. Erickson, a licensed architect, in 2001 with a scale model of the Visitor Center likewise constructed and shown to the WBGI investors at the annual meeting in June 2001 and approved by them, and likewise shown to prospective investors as the expected forthcoming Visitor Center (in promotional literature, etc.). Additionally, preliminary excavation of the Visitor Center site commenced in 2001. Sadly, those Visitor Center Account monies were diverted into the pocket of Mr. Yeh, and in an effort to cover up that fact, defendant Michie falsely claimed that I had spent those dedicated monies on myself (dedicated by having been deposited into a special Visitor Center Account deemed exclusively for construction of the

Visitor Center), which is one of the tort claims of defamation of the instant complaint in that I never had any control over any of those Visitor Center Account monies, and they were instead spent by defendants Michie, Francik and their board by payments made to Michie's crony Mr. Tom Yeh.

9.    Because I vigorously opposed their fraudulent legal actions, the Francik Board expenditures to Mr. Yeh et al. likely exceeded their original expectations.  Apparently because of their chronic shortage of funds for promoting their frauds, they commenced with selling off the WBGI lands, which liquidation of WBGI assets was used to further those fraudulent lawsuits.  The original nearly 300 acres was reduced over the course of several years by the Francik board to a small 26-acre parcel, with the primary assets sold to friends of the Francik board members without public offering or realtor assistance, but rather by private placement, in contravention to the original WBGI By-Laws.

II

## DEFENDANT FRANCIK'S BACKGROUND

10.   Defendant Francik did not become a WBGI investor until the project was well under way, and much of the botanical garden grown out, in 1999.

In 2000 or 2001 he increased his investment to a total of approximately $100,000. In 2001, at the annual shareholder meeting, he seemed interested in the development of the Visitor Center project as it was announced to the shareholders. It was at that meeting that the scale model of the Visitor Center was displayed to the WBGI shareholders. Unfortunately, a few months later, WBGI (and the rest of Hawaii) was hit with a sudden and severe downturn in tourism on September 11, 2001, essentially temporarily shelving the Visitor Center project for that year. It was two years before WBGI was again operating in the black with a return to normal tourism and pay-off of accumulated debt, and the Visitor Center project was again placed on the front burner. By that time, in 2003, defendant Francik was taking an active role in WBGI, including announcing to the shareholders of the dedicated Visitor Center Account opened that year, and promising to them (in his new capacity as a board member) that monies they invested beyond their initial investment would be placed into that dedicated account and used for no other purpose. Additionally, we commenced the *Special Use Permit* process at that time, a process that took a little over one year, and which was completed in early 2005.

11.   However, in 2004 things took a more ominous turn.  At a meeting with

myself in May 2004 outside of the office of the WBGI architect (Mr. Neil

Erickson) defendant Francik began acting erratically, yelling and arguing

loudly.  This was only a few minutes after he had been shown that letter

from WBGI's attorney, Mrs. Sherrill Erickson, stating that WBGI was in

good standing and naming the WBGI officers (myself, Dan Perkins, Linda

Wagner).  It was at that loud shouting fest that he announced to me that he

had been fired by the LAPD, prosecuted for felonies, but not convicted.

Apparently that was bothering him greatly, as he raised the subject himself

(I had been completely unaware of it).  I had also learned that his earlier

representation to me that he was a restaurant owner, following his

'retirement' from the LAPD, was greatly exaggerated. Rather, he told me he

had purchased two turn-key hot-dog stand franchises ('Cupids', a common

franchise in the LA area), not restaurants as I had been led to believe, both

of which he told me were money-losers for him, and that was what gave

him his financial expertise, i.e. being a business owner.

12.   In June 2004 I met with defendant Francik at *Ken's House of*

*Pancakes* to discuss the recent (May 2004) termination of payments on the

credit card loans I had made to WBGI.  At that meeting, defendant Francik

suggested I should sell some of my personal shares in WBGI to make those monthly payments, asserting that he even knew some persons who might be interested in buying them from me.  Over the next several months, as I sold off some of my personal shares (even while WBGI was selling shares, with the money received from those share sales deposited into the WBGI Visitor Center Account and WBGI general operating account), defendant Francik was kept apprised of my personal share sales by numerous conversations he had with David Adams and Dan Perkins, as they have related in sworn affidavits filed in these suits.

13.   In January 2005 his girlfriend, defendant Cobos, appeared at the WBGI office in Hilo asking David Adams for copies of the documents for my personal share sales (as detailed in his numerous sworn affidavits).  A few days later, circa late January 2005, defendant Francik conducted a telephone board meeting (with Mr. Perkins in telephonic attendance, and who reported thereon in numerous sworn affidavits) in which he announced to defendant Michie and the other board members that he (defendant Francik) had 'caught' me selling the corporate treasury shares and pocketing (embezzling) the money, and that I had been 'caught' in that

alleged crime by an "audit" that had been conducted by defendant Cobos in January 2005 when she visited the Hilo office.

14.   This deceit of defendant Francik, in which it appeared he was setting me up for a fraudulent criminal charge (embezzlement), brought forth numerous detailed affidavits by Mr. Adams and Mr. Perkins at my request, to detail the fact of defendant Francik's awareness of my sale of my personal shares during those preceding six months, including a meeting in September 2004 at the WBGI annual shareholder meeting in which defendant Francik, Mr. Perkins and Mr. Adams met in Hawaii and discussed the sale of my personal shares, with defendant Francik expressing his approval to Mr. Perkins and Mr. Adams by proclaiming to them that he preferred to see my share ownership reduced.

15.   Notwithstanding the extensive evidence detailing there was no embezzlement, and I simply sold some of my own shares (not the company treasury shares, then also being sold by Mr. Perkins) to make the monthly payments on the credit card loans, defendants Francik, Michie et al. voted circa May 2005 to initiate a suit against myself, and also against Mr. Tolman and the others of the Tolman board, who had taken action against the evident misuse of WBGI funds then ongoing, and the clear lack of

authority for the Francik board as detailed by WBGI's other longtime attorney, Mr. John Price of Honolulu, who wrote a letter on his law-office letterhead detailing how the Tolman Board was properly constituted.

16.   Thereafter, commencing in 2005, the Francik board began diverting extensive funds to Mr. Yeh et al. in support of their fraudulent litigations, depleting all of the monies that had been raised by Mr. Perkins in 2004 for WBGI by bringing in new investors (approximately $500,000), and by the existing shareholders who had placed their monies (approximately $220,000) into the dedicated Visitor Center Account in good faith that those monies would be used exclusively for construction of the intended Visitor Center, as promised orally and in writing by defendant Francik.  (It is ironic that the money Mr. Perkins raised and provided to defendant Francik was then used to file and maintain fraudulent suits that also named Mr. Perkins.)

17.   Nowhere in any of this did any of the defendants herein show any interest in any aspects of the botanical garden or in botany.  Defendant Francik told me that he had finished only 2 years of college before applying to become a fireman, for which he did not qualify physically, and so instead he became an officer with the LAPD.  At no time did defendant Francik ever express to me any interest in botany, or developing a botanical garden.

18.    Rather, unlike most of the investors in WBGI who love plants and the Hawaii gardens and were not interested in a fast return on their investment, but rather in making a beautiful botanical garden for the eternities that would be profitable, it became evident that defendant Francik was simply looking to make a fast buck, without regard to the underlying general plan for the botanical garden and the shareholder interests.  Unfortunately, his lack of wisdom and penchant for litigation (evidently acquired while 'serving' with the LAPD) and fraud has taken WBGI down a path from which only persons of Mr. Andrus' caliber can make it emerge as a viable corporation with a viable botanical garden plan.

III

CAL ANDRUS' BACKGROUND

19.    I first met Mr. Andrus circa 1992 when we were both engaged in other business ventures.  Mr. Andrus was still active in the US Air Force at that time.  We quickly realized we both had similar backgrounds, with a strong interest in botany and ecology.  We both had degrees from California Universities (Berkeley and San Jose), and when I told Mr. Andrus of my

14

dream for creating a huge botanical garden as a nature preserve, in Hawaii, he immediately became inspired to work with me on the project.

20.    Mr. Andrus and I began conducting meetings in 1993, which he organized, to develop interest in the Salt Lake City business community in the project.    In 1993 I also located the ideal garden site (I had begun scouting for a garden site in Hawaii in 1988), and in the summer of 1994 I negotiated a contract on those 300 acres of land for the garden.    Mr. Andrus became one of the earliest investors in WBGI, with money, time, and talent invested in WBGI.  As the plans came to fruition, I relocated from Salt Lake City to Hawaii to oversee the garden construction, leaving Utah in January 1995.  I had extensive contacts in Hawaii, having lived there off-an-on since 1967, and I was very familiar with the local culture, which is rather unique.

21.    Because Mr. Andrus had many other business ventures in which he was engaged with Salt Lake City businessmen, he remained behind in the Salt Lake City area to continue on those other efforts.   He was kept apprised of my efforts in Hawaii by quarterly Newsletters sent to him and newer shareholders.

22.    While Mr. Andrus might be a little older now than when we first met,

he retains the vitality of interest in the botanical garden project, and desires

to see it again become a positive project, free from guile, deceit and fraud,

where it can serve as a beacon for those who seek a home for peace and

beauty.  He would be the ideal candidate to place WBGI back on a proper

course.

DATED:  June 18, 2012

_____

Walter L. Wagner